193 N.J. Super. 133 (1984)
472 A.2d 588
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DONALD R. CONWAY, DEFENDANT-APPELLANT. STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALAN GRECCO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1984.
Decided February 14, 1984.
*138 Before Judges MATTHEWS, J.H. COLEMAN and GAULKIN.
Justin P. Walder argued the cause for appellant Conway (Walder, Sondak, Berkeley & Brogan, attorneys; Justin P. Walder and Gerald L. Shargel, of the New York Bar, on the brief).
Salvatore T. Alfano argued the cause for appellant Grecco (Clapp & Eisenberg, attorneys; Joseph T. Afflitto, of counsel).
Richard T. Carley, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
State Grand Jury Indictment 87-85-5(1)[1] charged Donald R. Conway, a member of the bar of this State, and Alan Grecco, with: conspiracy contrary to N.J.S.A. 2C:5-2 (Count One); tampering with a witness contrary to N.J.S.A. 2C:28-5a(1) and (2) *139 and 2C:2-6 (Count Two); tampering with public records contrary to N.J.S.A. 2C:28-7a(1) and 2C:2-6 (Count Three); tampering with physical evidence contrary to N.J.S.A. 2C:28-6(1) and 2C:2-6 (Count Four); promotion of official misconduct contrary to N.J.S.A. 2C:30-2b and 2C:2-6 (Count Five); attempt to promote official misconduct contrary to N.J.S.A. 2C:30-2b, 2C:2-6 and 2C:5-1 (Count Six), and bribery contrary to N.J.S.A. 2C:27-2c and 2C:2-6 (Counts Seven and Eight).
Samuel Lazzara, Joseph Lazaro, a State Police sergeant, and Vincent Rigolosi, who is also a member of the bar of this State, were also charged in the same indictment. A separate State Grand Jury Indictment arising out of the same incident, Number 87-81-5, charged Joseph Barcellona in a similar manner. Barcellona was an unindicted coconspirator in Indictment 87-85-5(1). His trial was kept separate from the other defendants' trial and scheduled for a later date.
Lazaro entered a plea of guilty to Counts One, Two, Five and Seven on July 8, 1982, and testified at trial for the State. After the trial, Barcellona entered a plea of guilty to Count One.
Trial of the other defendants was held before Judge Huber and a jury from September 13 through November 4, 1982. The jury found Conway guilty of conspiracy (Count One) and tampering with a witness (Count Two). Grecco was found guilty of conspiracy (Count One) and bribery (Count Seven). Lazzara and Rigolosi were acquitted on all counts. On March 22, 1983 Judge Huber merged Count One with Count Two and sentenced Conway to a suspended four year term in State Prison, $2,500 fine and $25 penalty payable to the Violent Crimes Compensation Board. With respect to Grecco, the judge merged Count One with Count Seven and sentenced him to a seven year term in State Prison, $1,500 fine and $25 penalty payable to the Violent Crimes Compensation Board.
Conway and Grecco appealed separately and their appeals were consolidated by us. Conway's subsequent motion to sever his appeal was denied.
*140 The case against defendants originated out of an altercation between Philip Lombardo, Jr. (Lombardo) and State Police Officer Denis McDowell outside a large seaside club in Ortley Beach, Dover Township, Ocean County, during the early morning hours of Sunday, July 19, 1981. The club was owned and operated by Barcellona. It contained seven separate bars, held in excess of 1,000 people and employed 28 full time "bouncers" to identify and control intoxicated patrons.
Prior to the McDowell-Lombardo altercation, Lombardo had been ousted from the club. Instead of leaving the area, Lombardo remained outside the club and acted suspiciously. McDowell frisked him and allegedly found one can of tear gas. Later that evening at closing, Lombardo banged on the door of the club, and when it was opened, threw a substance in McDowell's face. A chase and subsequent struggle ensued. Another can of tear gas was found in Lombardo's vehicle. McDowell consequently arrested Lombardo and charged him with simple assault, two counts of unlawful possession of a weapon (tear gas) and resisting arrest. During the arrest Lombardo boasted of his "family connections" that "ran New York and New Jersey" and would "take care" of McDowell.
Although McDowell testified that he previously worked at the club as a bouncer in violation of State Police regulations, it was disputed at trial whether he was working for the club on the morning of the Lombardo altercation. It was also disputed whether Lombardo returned to the club to telephone police that several patrons were damaging his car.
Shortly after the Lombardo arrest, McDowell, a member of the New Jersey State Electronic Surveillance Unit, reported to his State Police superiors that an attempt was being made to bribe him to dispose of Lombardo's case. An investigation, during which concealed recording devices were used, followed. Through that investigation it was learned that several individuals attempted different ways to dispose of the Lombardo case, including: bribery, an altered arrest report and a lineup ploy. *141 The State's case relied to a substantial degree on the tape recordings and the testimony of McDowell and Lazaro. That evidence disclosed the following.
On the morning of the altercation Conway was retained to represent Lombardo who was then jailed by the Dover Township police. Conway immediately dispatched an associate to represent Lombardo at the police station. Lombardo was released from jail and his impounded car was retrieved. Conway met and interviewed Lombardo the following day. He prepared to file a complaint against McDowell and the club. He also entered a formal appearance for Lombardo at the Ocean County Prosecutor's office and requested a probable cause hearing. Later that same day Conway telephoned Rigolosi, the attorney who represented Barcellona, the club's owner; they scheduled a meeting with Barcellona to see if the Lombardo matter might be disposed of amicably without litigation.
Conway met Barcellona for the first time in Rigolosi's law office on Wednesday, July 22, 1981. After discussing the altercation, Conway stated his client would not file counter complaints if McDowell would withdraw his charges. Barcellona replied that he "would be more than happy to resolve it by having the charges dropped." As a result, Conway never filed a cross-complaint. At a later date, however, Barcellona was recorded on tape stating that Conway "begged" him to do "anything that can be done ... I mean anything," to drop the charges.
On Friday, July 24, 1981 McDowell equipped himself with a recording device and went to Barcellona's club. McDowell spoke to Lazaro privately. Lazaro stated that Lombardo's father and Grecco were members of the Vito Genovese organized crime family and that the trooper's family might be in danger because of young Lombardo's arrest.
Through Lazaro's testimony at trial and the tape recorded conversation, it was established that Barcellona asked Lazaro to approach McDowell and inform him that Grecco offered to pay *142 $10,000 to get rid of the charges against Lombardo. When approached by Lazaro, McDowell acted interested in the bribe and stated that he could easily retype and alter the arrest report since it was not yet officially filed. In an effort to determine the true source of the bribe, McDowell requested to meet with Lombardo or Grecco. At the close of the July 24 tape recorded meeting, Lazaro telephoned his uncle, Lazzara, to arrange a meeting with Grecco, McDowell and himself.
The following evening Lazaro met Grecco at Lazzara's home. Grecco would not permit McDowell to be present at the meeting. Lazaro testified that the men discussed altering the arrest report or, in the alternative, having McDowell fail to identify Lombardo in a lineup. Lazaro further testified that Grecco refused to allow McDowell to meet with Lombardo, stating "our attorneys would get the reports" and "would be able to handle that."
Shortly after the meeting, Lazaro returned to Lazzara's home and received $5,000 to give to McDowell. Lazaro was told the money was from Grecco and McDowell would receive $5,000 now and $5,000 "when it's done."
Late that same evening McDowell, equipped with a tape recorder, went to Barcellona's club to meet Lazaro. The two men discussed the meeting with Grecco; Lazaro gave McDowell $4,900 and kept $100 for himself. Lazaro informed McDowell he would be paid an additional $5,000 when the charges against Lombardo were dropped.
On July 29, 1981 McDowell met Barcellona and gave him the two-page original arrest report and the one-page altered report. During this tape recorded meeting Barcellona indicated that Grecco and "those guys" wanted to see both reports.
On August 16, 1981 McDowell brought Lazaro to New Jersey State Police superiors. When confronted with the taped conversations Lazaro admitted the bribery and agreed to assist in the further investigation of the incident. State Police superiors told Lazaro to locate the original and altered reports and to meet *143 with the attorneys in the case to ascertain their involvement in the scheme.
Conway telephoned the Ocean County Prosecutor's office on August 17, 1981, to learn the status of the Lombardo case. On August 19, 1981 Conway and Rigolosi met Barcellona for lunch at a restaurant owned by Barcellona in Clifton. At this meeting Barcellona indicated to the attorneys that McDowell suggested having a lineup. According to Conway, however, Barcellona stated: "He's not sure he's got the right guy and why don't you just have a lineup and get the whole thing done that way." Conway testified that he attempted to dissuade Barcellona from having a lineup.
At Rigolosi's request, Conway returned that evening to an office above Barcellona's restaurant to meet with Lazaro, Rigolosi and Barcellona. Lazaro recorded their conversation.
During this meeting Barcellona stated that Conway was informed earlier that day about the suggested lineup ploy. The recorded conversation revealed that Conway and Rigolosi were aware that McDowell considered purposely failing to identify Lombardo to dispose of the case. Conway stated that McDowell would "look bad" if he failed to identify an individual he arrested. Conway also questioned if any other witnesses were present at the time of the altercation and arrest.
Lazaro then asked Conway if he possessed a copy of the arrest report or had seen the "original" report. Conway replied, "never saw either one." He further stated: "Well, there's only one report that's filed I assume." Shortly thereafter Lazaro explained to Conway: "There's no case number on the [report], the [report] just lays around. And that's what gave [McDowell] the opportunity to withdraw the [report] and change it." Lazaro told the attorneys that McDowell "skipped out on everything" in the second or altered report.
After listening to the discussion, Conway stated he could claim Lombardo was innocent if there was a lineup. Conway requested to see the arrest report to ascertain if any facts would *144 create a problem. Lazaro testified that he then obtained the altered report from his car, returned to the meeting and handed it to Rigolosi. The attorneys were told that the original report was accurate and detailed, whereas the filed report was slightly more than a paragraph in length. Rigolosi read the altered report aloud, at the conclusion of which Conway stated to Rigolosi, "Alright, we're in good shape." Eliminated from the original report was the location of the tear gas cannisters, Lombardo's statements made at the time of his arrest concerning his organized crime connections, and statements concerning Lombardo's initial ejection from the club.
When Lazaro said that he wanted assurance that no copies of the original report which had been borrowed by Barcellona were made, Conway acknowledged that he had such assurance "because the guy who I have implicit trust in, who I met early this morning ... [would not] let me see a copy of it" because he "had to give it back" to Barcellona. In response to Lazaro's inquiry, Barcellona identified the individual Conway referred to as Grecco. Before the meeting ended, Conway verified that he was to call the prosecutor and state that Lombardo was mistakenly arrested.
On August 28, 1981 Conway went to the Ocean County Prosecutor's office to discuss the Lombardo case. An assistant prosecutor reviewed the arrest report and proposed a plea bargain to simple assault. Conway, however, stated Lombardo's defense was mistaken identity. The assistant prosecutor then showed Conway two arrest reports, the one page altered report and a Dover Township police report prepared by Township Police officer Douglas D. Turchyn. After reading both reports, Conway informed the prosecutor that Lombardo would still claim that he was mistakenly identified.
On September 2, 1981 Lazaro telephoned Rigolosi at his law office and recorded the conversation. Conway was present in Rigolosi's law office at that time. Rigolosi stated that Conway would not be handling the matter in the way previously discussed. *145 He further stated that Conway was considering other avenues of approach such as the Pretrial Intervention Program, and that Conway would know more after a probable cause hearing. Lazaro was instructed to tell McDowell not to become concerned.
On October 15, 1981 Lazaro met Grecco at Lazzara's house and recorded the conversation. Lazaro informed Grecco that McDowell was confused about the way Conway intended to handle the case. Although Grecco acknowledged that Conway knew best, he stated "... to tell you the truth, I never spoke to [Conway]."
A probable cause hearing was scheduled for October 19, 1981. On that day an assistant Ocean County prosecutor informed Conway that the Lombardo case would be dismissed because the trooper could not positively identify Lombardo.[2] On October 21, 1981 Barcellona gave Lazaro an envelope containing $5,000 to be delivered to McDowell. Barcellona told Lazaro that Grecco gave him the money. As a result of the foregoing, Conway, Grecco, Rigolosi, Lazzara and Barcellona were arrested and subsequently charged as indicated above.
Grecco and Conway denied all charges. Conway presented the testimony of 24 individuals (including ranking law enforcement officers, prosecutors and prominent members of the New Jersey Bar) who disclosed that Conway was known for his excellent reputation in the community as being truthful, honest and law-abiding. Conway testified that he had no knowledge that bribery occurred. He further testified that he firmly believed he was innocent; he believed his actions were justified since he sought the best possible result for his client through an amicable resolution of cross complaints.
Based upon his contention that he had an ethical obligation to attend all meetings which might affect his client, Conway presents a twofold argument that the evidence against him *146 was insufficient and that he should have been granted a judgment of acquittal at the end of the State's case. See State v. Reyes, 50 N.J. 454, 458-459 (1967). First, he maintains that the trial judge erroneously permitted the jury to infer he was a coconspirator prior to the August 19, 1981 meeting. Second, that the record contains no evidence that he tampered with Trooper McDowell since it was his duty as a lawyer to ascertain all facts necessary to defend his client whether or not "those facts were corruptly gathered by others." He maintains that the Code of Professional Responsibility, EC7-10, and the American Bar Association (ABA) Criminal Justice Standards, § 4.4-1, support his position that the jury should not have been permitted to infer impropriety from evidence that established his attendance at the August 19, 1981 meeting.
He states that his attendance at that meeting was within legal bounds because he intended to resolve the matter amicably and investigate McDowell's reservation about identifying Lombardo. A distinction must be drawn between Conway's permissible attendance at this meeting and his impermissible conduct once there.
The pertinent sections of the ABA Criminal Justice Standards, the Defense Function, provide:
Standard 4-4.1. Duty to investigate
It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.
Standard 4-4.2. Illegal investigation
It is unprofessional conduct for a lawyer knowingly to use illegal means to obtain evidence or information or to employ, instruct, or encourage others to do so.
Canon Seven of the Code of Professional Responsibility also contains guidelines for representing a client. EC7-10 of the Code provides: "the duty of a lawyer to represent his client with zeal does not militate against his concurrent obligation to treat *147 with consideration all persons involved in the legal process and to avoid the infliction of needless harm." The Disciplinary Rule controlling the section, DR7-102, states that a lawyer must always represent a client within the bounds of the law.
When determining the bounds of permissible conduct, our Supreme Court established a proper procedure for an attorney to follow when seeking to have a complaint against his client dismissed. In re Friedland, 59 N.J. 209, 220 (1971). There it was determined that it was no longer permissible for an attorney to resolve litigation without regard for the criminal process. 59 N.J. at 219. In a per curiam decision, the Court stated:
[T]he unethical quality of [the attorney's] conduct consists of thwarting the criminal process without regard to whether the party complained of is in fact guilty. It is not for [the attorney] to determine whether one charged with a crime is guilty; this must be left to those legally charged with that responsibility. Of course, where the party complained of is actually guilty, the wrong done the public is even greater, for the wrongdoer goes unpunished and undeterred from continuing his criminal conduct. [59 N.J. at 219]
The proper procedure, the Court stated, is that
he must first go before the prosecutor and a judge and make a full and open disclosure of the nature of the charges and the terms, if any, under which the dismissal is sought. The dismissal should not be consented to unless both the judge and the prosecutor are satisfied that the public interest as well as the private interests of the complainant will be protected. [59 N.J. at 220]
The record establishes that Conway, despite his intention to resolve the Lombardo case amicably, did not follow this procedure. The record reveals that Conway met Lazaro, Barcellona and Rigolosi on August 19, 1981. At this meeting Lazaro, a State Trooper not involved in the Lombardo arrest, discussed disposing of the case. Lazaro was wired and the conversation was recorded. The recorded conversation reveals that Trooper McDowell considered purposely failing to identify Lombardo to dispose of the case. Conway expressed concern that the trooper would "look bad" if he failed to identify an individual he had recently arrested in a lineup. He stated that McDowell's situation was different from that of a frightened citizen in a bank robbery who might fail to identify a robber. He also noted *148 problems he discussed with Rigolosi earlier in the day with regard to seeking a lineup.
The conversation then focused on the arrest report when Conway questioned whether any witnesses were present at the altercation. Lazaro asked Conway if he had a copy of the arrest report or had seen the "original" report. The following colloquy occurred:
DC Well, I'd like to see it.
JL Denis, his original report was pretty lengthy. But, um  oh, did you see the original?
DC Never saw either one.
JL Okay, but ah, this one he just skipped out on everything.
DC Well there's only one report that's filed I assume.
JB That's all, yeah.[3]
Shortly thereafter Lazaro explained to Conway: "There's no case number on the [report], the [report] just lays around. And that's what gave [McDowell] the opportunity to withdraw the [report] and change it." Lazaro described the second altered report as one in which the trooper "skipped out on everything." After listening to the discussion, Conway stated he could claim Lombardo was innocent if a lineup was used.
As the meeting progressed, Lazaro told defendant Conway that he should have seen the original report because "the original [report] was very complete and concise and accurate and detailed." Barcellona mentioned that it was two pages long, while Lazaro added that the new one was "a little better than a paragraph." Lazaro, at Conway's request, then went out and brought back the altered report from his car and handed it to Rigolosi who read it aloud. Barcellona noted briefly that references to "the families" and being "connected" were deleted. After Rigolosi read the altered report aloud, Conway expressed his satisfaction: "Alright, we're in good shape." The "second" report eliminated from the original report the location where *149 the tear gas cannister was found, Lombardo's statements concerning his organized crime connections, and statements concerning Lombardo's initial ejection from the bar.
Most importantly, when Lazaro mentioned that he wanted assurance that no copies of the original report were made, Conway acknowledged that he had such assurance "because the guy who I have implicit trust in, who I met early this morning ... [would not] let me see a copy of it" because he "had to give it back" to Barcellona. In response to Lazaro's inquiry, Barcellona identified the individual Conway was referring to as defendant Grecco.
Based on those facts, we believe that the State presented sufficient evidence for the case to go to the jury and for the jurors to find Conway guilty beyond a reasonable doubt. The record also includes facts which, if accepted by them, the jury could reasonably infer that Conway was a coconspirator prior to the August 19, 1981 meeting. Those facts include:
1. Barcellona's recorded statement at Conway's meeting with Rigolosi and Barcellona on July 22, 1981 that Conway "begged" him to do "anything . .. I mean anything" to dispose of the case;
2. Conway's recorded statement that he did not believe Lombardo's version of the altercation;
3. Conway's attendance at the August 19, 1981 meeting with Lazaro, a State Trooper not involved in the Lombardo arrest. This fact is particularly important since Conway had already met with Barcellona and Rigolosi (the only other individuals present at the 8/19 meeting) earlier that day; the jury could reasonably question why Conway met with Lazaro on August 19th.
4. Conway's recorded statement at the August 19, 1981 meeting that he met with Grecco earlier that day and had implicit trust in Grecco that the original arrest report was not duplicated.
Conway argues that Grecco's statement in a tape recording made after August 19, 1981, that he never spoke to Conway, is sufficient to establish he was not a conspirator. That statement, however, was only one fact for the jury to weigh against all of the evidence. While the record reveals no evidence that Conway was involved in the bribery scheme, there was sufficient evidence that Conway was involved in tampering with the putative witness, Trooper McDowell. Conway cannot hide behind *150 the cloak of attorney responsibility to mitigate the inferences a jury might permissibly draw from his conduct at the August 19, 1981 meeting.
The standard established in State v. Reyes, cited above, is whether the evidence at the close of the State's case is sufficient to warrant a conviction of the charge involved. More specifically, the trial judge is obliged to determine whether, viewing the State's evidence in its entirety be it direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which might reasonably be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt. State v. Reyes, 50 N.J. at 459. We are satisfied that Judge Huber correctly determined to deny the motion for acquittal.
Conway also contends the jury verdict was against the weight of the evidence.
When reviewing the denial of a motion for a new trial an appellate court will not reverse the trial judge's decision unless it finds there was a "miscarriage of justice under the law." R. 2:10-1. The standard is whether "reasonable minds might accept the evidence as adequate to support the jury's verdict." Dolson v. Anastasia, 55 N.J. 2, 6 (1969). Jurors are free to accept or reject, in part or in whole, any aspect of testimonial evidence based on credibility. State v. Coleman, 46 N.J. 16, 43 (1965), cert. den. 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966).
We have discussed the evidence tending to support guilt in our treatment of the motion for judgment of acquittal at the end of the State's case. In advancing his contention as to the weight of the evidence, Conway has balanced the persuasiveness of portions of the evidence in his favor against the State's case. It is of no consequence, however, that there were inconsistencies in the testimony at trial. The jurors were free to believe or disbelieve the defense witnesses. As was stated in Dolson v. Anastasia, with respect to the judicial function in deciding and *151 reviewing a motion for a new trial because the verdict is said to be against the weight of the evidence:
[T]he judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror. It was said in Kulbacki [v. Sobchinsky, 38 N.J. 435] "[w]hat the trial judge must do is canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict...." 38 N.J., at 445. This does not mean that the test is the same as on a motion for judgment. Rather what was meant was that in ruling on a motion for a new trial, the trial judge takes into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called "demeanor evidence", and the intangible "feel of the case" which he has gained by presiding over the trial. The whole process is well summed up in the dissenting opinion in Kulbacki: "the question is whether the result strikes the judicial mind as a miscarriage of justice, ...", 38 N.J. at 459.
....
The standard governing an appellate tribunal's review of a trial court's action on a new trial motion is essentially the same as that controlling the trial judge. Hager v. Weber, 7 N.J. 201, 212 (1951) very correctly so held, at the same time putting to rest all constitutional questions and casting aside any more restrictive "abuse of discretion" test. We say the test is "essentially the same", because where certain aspects are important  witness credibility, "demeanor", "feel of the case", or other criteria which are not transmitted by the written record , the appellate court must give deference to the views of the trial judge thereon. His decision, however, is not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court. [55 N.J. at 6, 7]
In denying defendant's motion for a new trial on several grounds including newly discovered evidence, Judge Huber stated:
Mr. Conway's case, if you look carefully at that case, Mr. Conway was convicted, I think, in large part by Mr. Conway. There was some dispute about maybe what he said, and I'm sure the jury didn't believe that he said we'll do anything. He didn't give the impression to me as a witness, and I'm sure he didn't go to the jury, that he would do anything for a client. All the witnesses who testified in his behalf didn't come to testify for somebody who would do anything for a client. So I don't think that, however that was phrased, and you recall that was some of Barcellona's talk, as I remember  Lazaro wasn't there at that meeting in Rigolosi's office, but Barcellona was. He came back full of talk and was carrying on and so forth, a little braggadocio, maybe a little exuberance, but he was, I think, in his conversation not describing the Conway that this jury heard. But then we get into Mr. Conway's own testimony that this was a $250 case, a *152 Saturday night brawl at a Shore bar, which is just the way Mr. Denning looked at it. Then we have Mr. Conway by his own admission having lunch on one day, dinner on the evening, a scenario being talked about. The jury heard this on the tape. They heard the voices, the discussions about what this witness was going to do. This witness, McDowell, was going to go in and take a dive and when Mr. Conway met Mr. Denning  Mr. Denning testified and Mr. Conway testified. We are not concerned, now, about Lazaro's credibility. We are not concerned with Cutrone. We are not concerned with McDowell. We are concerned with the lawyer who sits down there with the prosecutor and the prosecutor making a standard offer that Mr. Conway has heard a thousand times in his lifetime of law practice, Hey, disorderly. Take a plea to disorderly. We are not going to present this to the Grand Jury. But the jury learned that Mr. Conway knew that in this match the State's witness had a hand tied behind his back. In other words, that witness was going to take a dive. That witness was going to lie. The jury could hear that. They heard it from the whole approach to the picture.
Mr. Hartman now says to me in effect, If I were doing it again, Judge, I'd argue State Police methodology and I might try entrapment. Well, Mr. Hartman chose to try the case that way, and as far as I'm concerned that was the way he tried it. Yes. There has been some back and forth between counsel on this, but I don't think it affects the integrity of the verdict. The case was hard fought. There were some unpleasant moments in the trial, but they were limited to the State. There was a witness who was accused of being a Judas and being asked, How do you like your thirty pieces of silver, et cetera. So these little things went on, on both sides as far as I'm concerned, and I don't point the finger at anybody. It was a hard fought trial and we often do things in the heat of combat that we might not do elsewhere. But when I sift all through this I am met with credibility of witnesses who were thoroughly examined.
In our judgment, these words spoken by the trial judge, albeit somewhat inartistically, graphically demonstrate his "feel of the case" which he has gained by presiding over the trial. We readily give deference to his views and conclude that the motion to set aside the verdict on the ground of it being against the weight of the evidence was properly denied.
Both defendants contend that the procedure employed by the trial judge in framing and delivering his charge, and the substantive charge itself, deprived them of their constitutional right to a fair trial. Procedurally, defendants contend:
1. the trial judge erroneously refused to hold a charge hearing;
2. counsel did not have ample opportunity to conform their summations to the jury charge thereby prejudicing them, and

*153 3. the trial judge, as a matter of plain error, erred by failing to instruct the jury to commence new deliberations after the supplemental charge on November 4, 1982.
Substantively, they contend:
1. Grecco was prejudiced because counsel did not know if the court would charge his claim that he abandoned the conspiracy, then was entrapped;
2. Conway was prejudiced due to the court's initial failure to instruct the jury in detail about the role of the defense attorney when defending a client, and that
3. the supplemental charge confused the jury and prejudiced defendants [not raised below].
R. 1:8-7 which controls requests to charge, provides:
At or before the commencement of the trial, or thereafter but before the close of the evidence as to issue not anticipated prior to trial any party may submit written requests that the court instruct the jury on the law as set forth in the requests. Copies of the requests shall be furnished all parties at the time they are submitted to the court. The court shall, on the record, rule on the requests prior to closing arguments to the jury. Objections to the instructions to the jury shall be in accordance with R. 1:7-2.
We first observe that no one requested the charge hearing referred to in this point. Our reading of this rule draws a distinction between a charge hearing and the requirement that the judge rule on jury charge requests on the record. Contrary to defendants' contention, the rule does not require a trial judge to hold a charge hearing in every instance. Rather, the trial judge has discretion to hold a charge conference in cases he deems "appropriate." Pressler, Current New Jersey Court Rules, Comment, R. 1:8-7 (1984) at 74.
The judge is required, however, to rule on the record before summation whether he will charge the jury according to defendant's request. In this case the judge did not rule on each of defendants' requests.
Defendants consequently argue that they were prejudiced by the trial judge's failure to hold a formal hearing, or rule on their requests, because they were not given ample opportunity to conform their summation to the jury charge. We disagree.
*154 The Comment to R. 1:8-7 states that the purpose of requiring the court to rule on a defendant's requests on the record prior to summation is to permit counsel to conform his summation to the court's intended charge and to assist the appellate court in reviewing alleged error. See Pressler at 74.
We are not sure what is meant by permitting counsel "to conform his summation with what the actual charge will be." It is the function of the trial judge to instruct the jurors in the law applicable to a case. It is sufficient merely to state the time worn instruction that the judge is the judge of the law and that the jurors are the judges of the facts to support this observation. Trial counsel should not be permitted to instruct the jurors during their summations as to what the law to be applied in this case is in anticipation of the judge's charge. If what is meant by the argument advanced here that counsel were hindered in determining which facts to emphasize or which of the trial testimony to comment on, then we do not find that defendants were prejudiced.
Defendants did not object to the trial judge's failure to hold a charge hearing or to rule on their requests to charge until after deliberations began. Based on Conway's objection, the trial judge permitted Conway to state his exceptions to the court's charge on the record. Although the record does not indicate that Grecco joined in Conway's objection to the trial judge's failure to hold a hearing, Grecco also stated his exceptions to the court's charge on the record. Defendants now argue that the judge's failure to rule on each of their requests prejudicially affected the structure of their summation. The record does not support defendants' claim.
Defendants were provided with an opportunity to raise issues and address the judge's jury charge prior to their summation. The record reveals that the judge advised counsel that he would charge the jury that Grecco's failure to testify could not be used against him. Counsel were further advised not to comment upon it in summation. The trial judge also received Grecco's *155 argument that the jury should be instructed on the defense of entrapment. Furthermore, defendants reargued all pretrial motions and motions made at the end of the State's case. Finally, the State requested the judge to charge the jury that an unfavorable inference could be drawn from defendants' failure to call Barcellona as a witness at trial. After hearing all counsel, the judge denied the motion and advised the State not to comment upon it in summation. In our view this pre-summation discussion on the record permitted defendants to shape their closing arguments. Defendants have not demonstrated, and we fail to find, any evidence in the record prejudicing them at summation.
In addition, before concluding his charge the trial judge excused the jury and gave counsel an opportunity to advise him as to what, if anything, should be added before he released the jury to deliberate. Specifically, he heard the arguments of counsel with respect to whether the jury should be charged on an attorney's responsibility to investigate a case, and whether he should charge on the effect to be given to prior convictions of two of the witnesses. Immediately thereafter, the jury commenced deliberations. The trial judge's procedure in this case, to request counsel to point out omissions in the charge immediately after the charge was completed, is customary. Goldstone v. Tuers, 189 N.J. Super. 167, 170 (App.Div. 1983). We find no prejudice to defendants.
Defendants further argue that the trial judge erred by failing to instruct the jury to deliberate anew after the supplemental charge was given. We disagree. There is no New Jersey authority supporting defendants' contention. Judge Huber's original charge on November 3, 1982 and supplemental charge on November 4, 1982 were accurate. Accord State v. Thompson, 59 N.J. 396, 411 (1971). Hence, it was proper for the trial judge to instruct the jury to consider the charge, original and supplemental, as a whole. Goldstone v. Tuers, 189 N.J. Super. *156 at 170-171; see, e.g., Miller v. Martha Constr. Co., 48 N.J. 550 (1967).
Defendants allege that substantive inadequacies in the judge's jury charge require reversal of their convictions. Grecco asserts that Judge Huber's failure to hold a charge conference before summation prejudiced him because he did not know whether the jury would be charged on his theory that he abandoned his criminal intent and then was entrapped by State informants. Grecco requested the judge to instruct the jury that a defendant does not have to prove entrapment. Grecco raised his theory both before summation and after the jury charge was concluded. Contrary to Grecco's request, the judge charged the jury that Grecco, in the event that they were satisfied that the State had proved the offense charged beyond a reasonable doubt, has the burden of proving entrapment by a preponderance of the evidence pursuant to N.J.S.A. 2C:2-12(b). When a juror requested additional information applying the facts to the law, Judge Huber subsequently recharged entrapment. Entrapment was adequately charged.
Grecco also argues that N.J.S.A. 2C:2-12(b) is unconstitutional because it places a burden on a defendant to prove entrapment. While we are aware of the holding of this court in State v. Rockholt, 186 N.J. Super. 539 (App.Div. 1982), we are also aware that the Supreme Court granted certification, 93 N.J. 273 (1983), and has recently heard oral argument in that case. We need not, however, pass on this argument since the jury acquitted Grecco of the second alleged bribe of $5,000. It was with respect to this payment that entrapment defense was interposed. Thus there is clearly no demonstration of prejudice.
Conway asserts that he was prejudiced due to the judge's failure initially to instruct the jury properly about the function of a defense attorney when investigating his case. Although the trial judge initially charged the jury that Conway claimed he was acting as an attorney and not in furtherance of the conspiracy, he supplemented this charge after the jurors *157 posed questions to him. The supplemental charge fully explained a lawyer's duty when investigating his client's case. It is well settled that a jury charge must be reviewed in its entirety and cannot be regarded as a series of unrelated statements. State v. Wilbely, 63 N.J. 420, 422 (1973). Conway's claim that the first hours of deliberation before the supplemental charge "infected" the supplemental charge is therefore meritless. If the charge as a whole indicates no prejudicial error, then the jury verdict must stand. State v. Thompson, 59 N.J. 396, 401 (1971).
Both defendants next argue, for the first time, that the supplemental charge confused the jurors. The supplemental charge occurred on November 4, 1982 in response to a jury question indicating that the jury needed additional instruction on each of the substantive counts. The question submitted to the judge in writing, read:
Will you please give us a short summary of how each of the eight counts apply or relate to this case?
It is apparent that the jurors had become somewhat adrift in their deliberations and were somewhat confused as to how the law explained to them by the judge was to be applied to the testimony they had heard. In an effort to crystalize the jurors' question, the judge asked them for some clarification. The second note read:
Please give us an example of guilt or innocence relating to each of the eight counts....
When a jury requests clarification, the trial judge is obligated to clear the confusion. United States v. McCall, 592 F.2d 1066, 1068 (9 Cir.1979), cert. den. 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979).
In response to the jurors' questions, and in an effort to clarify the issues about which they were confused, Judge Huber undertook to translate what had been a formal and somewhat legalistic charge into language he believed would be understood by the jury. Understandably, the effort took some time since the judge scrupulously and successfully attempted to couch his *158 examples used to demonstrate the legal principles in terms of the contentions of both the State and defendants. The supplemental charge did not contradict any instruction previously given. It painstakingly restated all the facts established at trial and how those facts could relate to the law. Defendants did not object to the procedure followed. In fact, they requested the judge to continue the charge. The record establishes that the jurors' confusion was alleviated. There was no error.
Both defendants assert that their conspiracy conviction should be reversed because the trial judge's instructions permitted the jury to convict them for conspiring with persons who merely feigned to be engaged in unlawful activity while in actuality they were agents of the State Police. State v. Mazur, 158 N.J. Super. 89 (App.Div. 1978), certif. den. 78 N.J. 399 (1978), is the authority principally relied on for this contention. In Mazur this court held that under the then prevailing law (N.J.S.A. 2A:98-1) a feigning party could not conspire to commit a crime, and that it was necessary that the conspirators have a shared objective. 158 N.J. Super. at 97.
The State argues that, under the facts presented, all acts charging conspiracy in this case are subject to Title 2C of the Criminal Justice Code (N.J.S.A. 2C:5-2) which recognizes unilateral conspiratorial culpability, rather than Title 2A of the Code which did not recognize the unilateral theory. The State therefore asserts that undercover agents are conspirators under Title 2C and their acts and statements may be imputed to defendants.
Defendants' argument is twofold: (1) Substantively, that there is no unilateral definition of conspiracy, and (2) Evidentially, that acts and statements of undercover agents cannot be evidence of defendants' guilt. Defendants both maintain that the trial judge was required to instruct the jury that they could not convict them on a finding that they conspired with undercover police agents, McDowell and Lazaro. They further maintain that the trial judge's failure to so instruct mandates reversal, relying on Mazur. They did not request such a charge, or *159 object to the charge given, and now advance this theory as a matter of plain error.
Defendants and their coconspirators were charged under N.J.S.A. 2C:5-2 which became effective on September 1, 1979. Defendants do not dispute the fact that the conspiracy began on or about July 20, 1981 as charged in the indictment. Accordingly, all acts charged in the conspiracy are subject to the provisions of Title 2C, rather than Title 2A.
Title 2A of the New Jersey Statutes required an agreement between two guilty conspirators to have a conspiracy. Consequently, if one person with whom a defendant conspired secretly intended not to follow through with their plan, neither party could be convicted because there was no "agreement" between two persons. Title 2C, however, recognizes unilateral conspiracies. According to the drafters of N.J.S.A. 2C:5-2, the focus is on each individual's culpability rather than on the conspiratorial agreement. II Final Report of the New Jersey Criminal Law Revision (1971) at 131. N.J.S.A. 2C:5-2 is derived from the Model Penal Code. The commentary to the Penal Code, as quoted in the Final Report states:
The problem arises in a number of contexts ... Second: Where the person with whom the defendant conspired secretly intended not to go through with the plan. In these cases it is generally held that neither party can be convicted because there was no "agreement" between two persons. Under the unilateral approach to the (Code), the culpable party's agreement was feigned. He has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by the other's secret intention. True enough, the project's chances of success have not been increased by the agreement . .. But the major basis of the conspiratorial liability  the unequivocal evidence of a firm purpose to commit a crime  remains the same.
Hence, a police agent's purpose is not relevant to the issue of whether another conspirator had criminal purpose. Although we have not directly addressed this issue, it has been held that a defendant may be culpable even if the police agent was the only other participant in the conspiracy. State v. LaForge, 183 N.J. Super. 118 (Law Div. 1981). We conclude, accordingly, that undercover agents can be conspirators for the purpose of proving *160 that a conspiracy existed. Our conclusion is buttressed by the principle: "it is no defense that success was impossible because of unknown circumstances." 16 Am.Jur.2d Conspiracy § 10, 225 (1979) (discussing Federal Evid.R. 801(d)(2)(E)). There was therefore no error in the judge's charge that the undercover agents were conspirators.
Conway further contends that the trial judge erred when he instructed the jury to consider the acts and statements of McDowell and Lazaro.
The State argues that the acts and statements of McDowell and Lazaro are admissible under Evid.R. 63(9)(b). Conway argues that their acts and statements are not admissible because the "in furtherance" requirement of Evid.R. 63(9)(b) was not satisfied.
Under the unilateral conspiratorial culpability theory, McDowell and Lazaro were conspirators. Statements of all persons found to be conspirators are admissible under Evid.R. 63(9)(b) which provides:
A statement which would be admissible if made by the declarant at the hearing is admissible against a party if ... (b) at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.
Under this rule, a conspirator's statement must be "in furtherance" of the conspiracy in order to admit the statement as evidence of a defendant's guilt. Consequently, the inquiry is whether the making of the statements did anything in furtherance of the conspiracy. No New Jersey case has yet to determine whether the statements of an undercover agent are "in furtherance" of the conspiracy. Conway suggests that we should be concerned with whether the statements are in furtherance of a common, unlawful purpose. According to Conway, the key word is "common." Conway claims that since statements by undercover agents are not "in furtherance" of a common unlawful purpose, they cannot be admitted as evidence of defendants' guilt under Evid.R. 63(9)(b). We disagree. Where unarrested conspirators are still capable of carrying out the ongoing conspiracy, *161 their conversations with an undercover agent (McDowell, and later Lazaro) or with an arrested conspirator (Lazaro) should be admissible for Evid.R. 63(9)(b) purposes. United States v. Hamilton, 689 F.2d 1262, 1269 (1982), cert. den. 459 U.S. 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983).
The jury was charged that in order to consider the undercover agents' statements, or the statement of any conspirator against defendants, it must find by independent proof the existence of the conspiracy, participation in the conspiracy by both declarant and the defendant, and that the statements were made in furtherance of the conspiracy. Thus, Judge Huber allowed the undercover agents' statements and acts to be admitted subject to the condition that the above requirements were fulfilled.
That charge was reiterated in the supplemental charge.
Conway cites various occasions on which the trial judge purportedly erred in his conspiracy charge. Since defendant's underlying premise with respect to the judge's charge, i.e., that agents cannot be conspirators, is incorrect, these citations to the transcript, although out of context, still establish no error on the part of the trial judge. Further, the reference by the judge to coconspirators McDowell's and Lazaro's statements as binding on defendant is simply incorrect. A reading of those citations to the transcript satisfies us that neither Trooper McDowell's actions nor Lazaro's actions were highlighted as the defendant's brief implies.
We also note that Conway's counsel requested, and was given, the correct conspiracy charge when Lazaro was testifying at trial. The jurors were required to find that statements made by the undercover agents were in furtherance of the conspiracy before they could consider those statements against each charged conspirator. The errors of the trial judge claimed to have been made in the conspiracy charge to the jury were therefore not "capable of producing an unjust result." R. 2:10-2.
*162 Defendant Grecco maintains that the introduction of Barcellona's tape recorded statements into evidence violated his Sixth Amendment right to confrontation because Barcellona could not be cross-examined. Grecco further maintains that Barcellona's statements were not sufficiently reliable to justify his unavailability; he raises this argument as plain error.
The courts of this State have long recognized the admissibility of coconspirators' statements against other defendants. State v. Louf, 64 N.J. 172, 175-176 (1973); State v. Carbone, 10 N.J. 329, 340-341 (1952). It is also well established that evidence consisting of what otherwise would be hearsay statements made by coconspirators pursuant to Evid.R. 63(9)(b) does not offend the Sixth Amendment's guarantee of the right to confront witnesses. State v. D'Arco, 153 N.J. Super. 258, 263 (App. Div. 1977); State v. Boiardo, 111 N.J. Super. 219, 230 (App.Div. 1970), certif. den. 57 N.J. 130 (1970), cert. den. 401 U.S. 948, 91 S.Ct. 931, 28 L.Ed.2d 231 (1970). See State v. Sherwin, 127 N.J. Super. 370, 382 (App.Div. 1974), certif. den. 65 N.J. 569 (1974), cert. dism. sub nom. Loughran v. New Jersey, 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1974); State v. Seaman, 114 N.J. Super. 19, 26-28 (App.Div. 1971), certif. den. 58 N.J. 594 (1971), cert. den. 404 U.S. 1015, 92 S.Ct. 674, 30 L.Ed.2d 674 (1972). Cf. United States ex rel. Seaman v. Cryan, 329 F. Supp. 875 (D.N.J. 1971) (Evid.R. 63(9)(b) is not only coextensive with the federal coconspirator hearsay exception, but is also well within the conspirator hearsay exception to the confrontation requirement). Moreover, in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court confirmed the vitality of this hearsay rule by holding that a coconspirator's statements were admissible where the statements were made in furtherance of the conspiracy, even though the declarant could not be cross-examined. 418 U.S. at 700-701, 94 S.Ct. at 3101-3102.
Grecco asserts that the introduction of Barcellona's taped statements deprived him of a fair trial because Barcellona could *163 not be cross-examined. He places reliance on Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and State v. Williams, 182 N.J. Super. 427 (App.Div. 1982), and claims that those cases require that the State prove Barcellona was unavailable before his statements were admissible as those of a coconspirator. These cases, however, are clearly inapplicable to defendant's assertion of error because they concern hearsay exceptions other than the coconspirator hearsay rule. Moreover, in Ohio v. Roberts, the Court was careful to note that a "demonstration of unavailability is not always required." 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7.
And, in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Court upheld the admissibility of a statement, made to one of the State's witnesses by a coconspirator, under circumstances in which the admission was made after completion of the conspiratorial act, but was permissibly allowed under the law of Georgia.
As in Dutton, the declarant Barcellona was available to defendant Grecco. Defendant Grecco's codefendants took an interlocutory appeal to this court in order to compel the State either to try the charges against Barcellona first, so that his jeopardy would be eliminated, or, alternatively, to have Barcellona immunized against self-incrimination if called by defendants as a witness. We granted that relief. Nevertheless, with that remedy available, defendant did not summon Barcellona as a witness.
It is apparent, in any event, that Barcellona would not have been available to the State of New Jersey because he could have exercised his privilege against self-incrimination. Nothing would compel the State to seek immunity for him.
Of course, defendant cannot be convicted on the statements of coconspirators alone. There must be independent evidence that a conspiracy exists and that defendant was a participant. That requirement insures that the otherwise hearsay evidence, insofar as coconspiratorial statements are concerned, *164 will not itself fulfill the required evidential basis to convict defendant. See State v. Phelps, 187 N.J. Super. 364, 368-370 (App.Div. 1983), certif. granted 93 N.J. 309 (1983); State v. D'Arco, 153 N.J. Super. 258 (App.Div. 1977). Both during the trial and in his final instructions to the jury, the judge charged that before the coconspirators' statements could be considered, those independent findings had to be established to the jury's satisfaction.
The State expresses disagreement with Grecco's assessment of the impact of Barcellona's statements. It points out that Grecco's conviction rested upon much more than Barcellona's taped statements. Joseph Lazaro testified that he met Grecco and thereafter received $5,000 from him, as the first installment of the bribe. Later, Lazaro spoke with defendant and recorded their conversation. That recording demonstrated defendant's knowledge of the arrangement for paying off Trooper McDowell.[4]
Grecco had the opportunity to produce Barcellona's testimony. He chose not to call Barcellona as a witness at trial. Grecco's argument on appeal is based solely on the fact that he did not confront Barcellona at trial. Under the circumstances we can find no distinction between the testimony Grecco sought to elicit through cross-examination (that which Grecco now seeks) and direct examination (that which Grecco would have received had he called Barcellona as a witness). Hence, we find no error.
Both defendants claim that references to organized crime during the trial tainted the proceedings and resulted in an unfair trial. Defendants maintain that their convictions resulted *165 from prejudice inherent in references to organized crime that occurred throughout the trial.
The subject of organized crime was not introduced into the case by the prosecutor; it was present from the inception and later evidenced by the actions of the various defendants. The events which led to defendants' prosecution initiated with Lombardo's words that he was "connected," that "his families ran New York and New Jersey" and that he would "get" McDowell. The aura of organized crime was therefore present from the moment Lombardo was arrested. The record reveals that Lombardo was the son of an alleged mobster. Lombardo's connection to organized crime thus provided the motive for defendants' corrupt efforts on Lombardo's behalf. In addition, most of the references to organized crime that ran throughout the case were revealed by the conspirators' own words on the tape recordings. Consequently, it was necessary for witnesses to explain the positions and relationships of the speakers on the tape, and the terms they used, in order for the jury to understand what was transpiring. See State v. Zicarelli, 122 N.J. Super. 225, 239-240 (App.Div. 1973), certif. den. 63 N.J. 252 (1973), cert. den. 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973). Defendants on appeal do not challenge the admission of any tapes, rather, they attack the explanatory efforts of the State in presenting their evidence.
Grecco first cites a portion of the July 24, 1981 taped conversation during which Lazaro explained the leadership of the organized crime family with whom Barcellona had met in the days immediately after Lombardo's arrest. This reference provided the background against which Lombardo's words "I'm connected" and "I'll get even with you" had meaning and demonstrated that Lombardo's threats were not idle boasting. Further, it served to identify who was acting in the interest of Lombardo, and the organized effort that was behind that. As evidenced at trial, that effort was made because of who Lombardo was.
*166 Grecco also cites references to "other crimes" that were referred to in the tapes played at trial. Various references to Grecco as a "hit man" or as someone who "wasted" people were deleted from the tapes by the trial judge who was conscious of the prejudicial effect such references could have.
Defendant refers to a taped conversation about Anthony Fuvi and money lent to a person identified as Farmer Russo. In that discussion, Lazaro told Trooper McDowell that McDowell's involvement also provided a mechanism for Barcellona to recover his money from a prior transaction with Grecco. This conversation occurred less than a week after the arrest of Lombardo. Lazaro was still a rogue trooper whose statements were consistent with prior statements about the dangerous people with whom Trooper McDowell was involved. The statement was part of the res gestae of the developing conspiracy. State v. Sinnott, 24 N.J. 408, 413 (1957).
Moreover, the conversation relating to Fuvi was introduced to explain, among other things, Lazaro's and Barcellona's motive for participating in the conspiracy. It further proved initiation of the plan, detailing that not only was Grecco willing to pay $10,000 to Trooper McDowell, but he was also willing to "square away" the prior transaction with Barcellona in order to have "a favor" done for Lombardo. The testimony also demonstrated a prior relationship between Grecco and Barcellona which provided one nexus for initiation of the conspiracy. The evidence was relevant and was not introduced to prove any predisposition to commit a crime. State v. Sinnott, 24 N.J. at 413; State v. Hummel, 132 N.J. Super. 412, 425 (App.Div. 1975), certif. den. 65 N.J. 102 (1975). In addition, it is not clear that Grecco was the person Lazaro referred to in this conversation. The State did not seek to develop, through Lazaro or any other witness, that Grecco had "shylocked" any money. The evidence was relevant and probative only for the reasons discussed and not to prove that another crime had occurred. See State v. Wilson, 158 N.J. Super. 1, 5-6 (App.Div. 1978), certif. den. 79 N.J. 473 (1978).
*167 Grecco cites one more example in the tapes, specifically his association with a "stone killer." The conversation occurred on July 24, 1981, five days after Lombardo's arrest. Barcellona was describing his meetings with Grecco in the immediately preceding days. He related whom Grecco was with and his daily activities. This recorded conversation, because of the detail, corroborates that the meeting occurred. There was no reference to untoward conduct by Grecco or his associate. With regard to Grecco's brief reference to the "Thunderbird Hotel incident" and the murders of two policemen, those events were never attributed to him, nor did the State ever suggest that they were. The events mentioned were simply part of an ongoing conversation. In any event, no objection was raised and the inclusion of those brief references clearly does not amount to plain error. R. 2:10-2.
Both defendants next point to the testimony of Lieutenant Buccino of the State Police who explained the responsibility of the Intelligence Bureau, specifically with respect to organized crime families. He testified that he had advised Trooper McDowell about the suspected connections to organized crime of Barcellona and Lombardo. The trial judge noted at sidebar that, until that point, counsel had not objected to the substance of the questions to, or responses of the lieutenant. More importantly, during the colloquy at sidebar concerning continuing the testimony of Lieutenant Buccino, the judge recognized that organized crime was part of the case, but did not want the focus to be shifted from the charges upon which defendant was being tried.
Defendants cite one more instance as prejudicial in Lieutenant Buccino's testimony and note a reference to a specific organized crime figure. It is sufficient to note that the testimony referred specifically to Phillip Lombardo, Sr., whose son's activities were responsible for the investigation. It was Lombardo, Jr., not his father, who claimed on July 19 that his family ran New York and New Jersey.
*168 Both defendants also cite as prejudicial the testimony of Lazaro and the deputy attorney general's questions directed to Lazaro to explain statements on the tape. The deputy attorney general asked Lazaro what he meant by defendant Grecco having "worked himself [into] a pretty good position." He then asked Lazaro if "Little Al" would someday be "Big Al." The judge struck the remark as gratuitous but, in fact, the remark was the very next statement in the transcript and had been made by Barcellona.
Both defendants also mention the reference by the prosecution to the Federal Witness Protection Program as a grave violation in developing the evidence in the case. On October 5, 1982, Judge Huber ruled the witness could not state the reasons why he was admitted into that program. When the witness was examined before the jury, the program was correctly noted as one of the benefits the witness was getting when the terms of the plea bargain were outlined. Grecco moved for a mistrial. The deputy attorney general later corrected the misnomer being used during Lazaro's cross-examination on the subject. Grecco now contends that reference to the witness' status somehow prejudiced him. The deputy attorney general was prohibited from developing the reasons for Lazaro's presence in the program and acted consistently with the limitation put upon him by the judge at defendant's request. No harm derived from stating that the witness was a participant.
The references to organized crime during the trial were necessary to explore the relationships of the parties and their roles in the development of the case. Introduction of such references were proper for that purpose alone. State v. Zicarelli, 122 N.J. Super. at 239-240. As the case developed and the references to the various meetings occurred, the relationship among the various witnesses and defendants unfolded, and the various nether world activities and associations of the involved parties were revealed.
*169 Mere reference to organized crime does not establish prejudicial error. United States v. Lazarus, 425 F.2d 638, 641 (9 Cir.1970), cert. den. 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970), reh. den. 400 U.S. 954, 91 S.Ct. 233, 27 L.Ed.2d 261 (1970). The references to organized crime in this case were not deleterious, and we find no evidence that defendants were unduly prejudiced. Moreover, the trial judge briefly noted in his original jury instruction that this was not an organized crime case. He further offered to charge the same in his supplemental charge. Grecco declined the offer, claiming it would highlight the issue. Conway took no position. The trial judge therefore chose not to instruct further.
Conway maintains that the trial judge erred in excluding the testimony of a proffered defense expert, Dr. Roger Shuy. He contends that Shuy is an expert in "discourse analysis," a discipline allowing him to determine the intent of the speaker in covertly recorded conversations. The State strongly opposed this testimony and argued that Shuy's testimony was not scientifically reliable and would confuse the jury. The State also argued that Shuy's testimony was not necessary since Conway had full opportunity to explain during his examination what he meant at the tape recorded meetings, and in addition, could cross-examine State witnesses. The witness was offered at trial as an expert in applied linguistics and sociolinguistics.
Judge Huber after holding a preliminary hearing excluded Shuy's testimony because he found that the expertise sought to be advanced was not recognized as scientifically reliable; that the testimony the expert would offer would tend to confuse rather than assist the jury, and that the testimony lacked objectivity and was therefore unduly prejudicial.
In order to introduce scientific evidence, the proponent must demonstrate that the expert's technique has "sufficient scientific basis to produce uniform and reasonably reliable results and will contribute materially to the ascertainment of the *170 truth." State v. Cavallo, 88 N.J. 508, 517 (1982); State v. Hurd, 86 N.J. 525, 536 (1981); State v. Cary, 49 N.J. 343, 352 (1967).
Reliability of the evidence can be established by three sources of proof: expert testimony, scientific and legal writings, or judicial opinions. Cavallo, 88 N.J. at 521.
Shuy testified that it was not his purpose to tell the intent of the speaker but to look at the "clues" in a conversation that demonstrate the speaker's intention from the words used. Our reading of Shuy's testimony indicates that he sought to apply principles of linguistics to covertly recorded conversations. He testified, however, that covert recordings were considered to be an unethical practice in the field of linguistics. He further stated he had a "natural predisposition against the ethics of it...." The reliability of Shuy's analysis of covert recordings was further undermined by Dr. Westcott, the State's expert, who disputed its acceptance in the linguistics community. Scientific reliability was therefore not established by expert testimony.
Shuy also admitted that there are no scientific or legal textbooks in the area of linguistics' application to surreptitious tape recordings. He described this area as a new field, and he acknowledged that there were only four other Linguists involved in analysis of covert recordings. We find there are no judicial authorities that accept the type of evidence Shuy offered. Discourse analysis has not gained general acceptance in the field of linguistics. See United States v. Frye, 293 F. 1013, 1014 (D.C. Cir.1923). Hence, Judge Huber was justified in concluding that Shuy's testimony was not scientifically reliable.
Shuy's testimony also contained technical terms and was the source of potential confusion. See Evid.R. 4. Such confusion is exemplified by Shuy's own words:
[M]y role is ... to help explain the strategies that are used in the conversation among alternative strategies that are available for him to use and point out on the basis of what's actually on the tape and verifiable what he actually did in *171 light of the context of this particular isolated strategy, to point out also the consistencies or inconsistencies as they may be.
We conclude that the trial judge properly excluded Shuy's testimony.
Defendants next argue that the trial judge erred in denying their motions for a new trial based upon newly discovered evidence.
A motion for a new trial upon the ground of newly discovered evidence is not favored and should be granted with caution by a trial court since it disrupts the judicial process. State v. Haines, 20 N.J. 438, 443 (1956). In order to be entitled to a new trial defendants must show that the evidence (a) is material to the issue and not merely cumulative, impeaching, or contradictory; (b) was discovered since the original trial, and was not discoverable by reasonable diligence prior thereto, and (c) is of the sort which would probably change the jury's verdict if a new trial is granted. State v. Carter, 85 N.J. 300, 314 (1981).
Judge Huber was informed on February 9, 1983 by Barcellona's attorney, Miles Feinstein, in an in camera, ex parte, conference that he (Feinstein) had had a private conversation with Lazaro on October 18, 1982. Feinstein told the judge that Lazaro stated he lied at trial and that the State Police knew it. According to Feinstein, Lazaro allegedly said that he would deny ever having such a conversation with Feinstein unless Barcellona went to trial. Feinstein testified that he juxtaposed those events with plea discussions with the State, during which the State purportedly proposed to offer a recommendation of a non-custodial sentence to Barcellona. During that same in camera conference, Feinstein stated that Lazaro told him about directions which the State Police gave him. Feinstein sought a sealed order from the judge to produce Lazaro in order to interview him without the State's knowledge. Contrary to Feinstein's request, Judge Huber advised the attorneys for the State and defendants of the proceedings. On March 4, 1983, the *172 judge conducted a hearing on the allegations Feinstein had made. Feinstein and Lazaro both testified and were subject to questioning by Judge Huber and to cross-examination by counsel.
Lazaro testified that he had agreed to see Feinstein and that Charles E. Starkey, his attorney, was supposed to have attended. Lazaro denied telling Feinstein that he would speak to him again if Barcellona went to trial; denied that he lied at trial about anything or that he had told Feinstein he lied; denied telling Feinstein he had been confronted by the State Police before August 16, 1981; denied telling Feinstein he would deny publicly having made the statements alleged to have been made to Feinstein; denied having access to newspapers while the trial was in progress and testified, in fact, that Feinstein told him to read the newspapers, and denied that he told Feinstein he got into the case originally to make money. Lazaro repeatedly stated that it was Feinstein who had wanted to see him, not the reverse. At the conclusion of the hearing, Judge Huber denied the new motion. He obviously disbelieved Feinstein, as do we.
It is clear that the newly discovered evidence, if true, would have been material.
Judge Huber concluded, quite properly, that the evidence presented touched only upon the credibility of witnesses who had been extensively cross-examined. He therefore held the "evidence" was peripheral and would probably not change the jury's verdict. We agree.
The decision on a motion for a new trial is within the sound discretion of the trial judge and should not be disturbed on appeal unless there has been a clear abuse of that discretion. State v. Puchalski, 45 N.J. 97, 102 (1965). The trial judge's assessment of credibility should be given deference on appeal. Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969); State v. Johnson, 42 N.J. 146, 161 (1964). Lazaro's credibility was extensively explored, both directly and through other witnesses, at trial. In *173 addition, the State Police detective who gave Lazaro instructions was extensively cross-examined on his directions to Lazaro.
The "evidence" proffered by Feinstein was clearly a tissue of lies which could not survive the scrutiny of the judge and the cross-examination of the attorney general. Its false nature was patent, and its proffer constituted an insult to the intelligence of the judge. As he noted, in denying the motion for a new trial on this ground:
I don't find that the State mounted a scenario where they made an arrest in July and then, or confrontation in July and then decided to reenact something in August. What's the purpose of all that? What possible purpose would it serve for Captain Carney to get on the stand and lie about August 16th and the things that happened? No purpose at all in the Court's opinion.
Judge Huber did not consider the "evidence" brought forward to be the kind that would probably change the jury's verdict. We agree.
Grecco maintains that the trial judge erred in denying his motion for an evidentiary hearing based upon suppression of evidence.
At the conclusion of the trial, Grecco requested an evidentiary hearing on the ground that a proposed witness, Sam Cutrone, allegedly had the following information: (1) McDowell lied when he testified that he was not working the night he arrested Lombardo; (2) McDowell had been fired from the police department; (3) McDowell lied at the trial when he said he ran out the front door rather than the back door to chase Lombardo, and (4) Barcellona's cousin was collecting tickets at the door the night of the arrest of Lombardo. An unsworn statement of one Herbert Gross was also submitted to the judge claiming that Lazaro's statements about him in one of the taped conversations introduced into evidence was a lie.
Judge Huber denied the request for an evidentiary hearing. Grecco asserts on appeal that the denial of the hearing was a Brady violation. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
*174 In order to establish a Brady violation, the defense must demonstrate that (1) the prosecution failed to disclose evidence; (2) the evidence was of a favorable character for the defense and (3) the evidence was material. If the undisclosed evidence was merely cumulative or repetitious as to the purpose for which it could have been used, then the verdict need not be reversed. State v. Carter, 85 N.J. at 313. The trial judge concluded the proffered evidence to be cumulative and went only to the credibility of witnesses who had been thoroughly examined.
The defense called several witnesses to describe the events surrounding the arrest and cross-examined McDowell about his former relations with the Ocean Gate Police Department. Moreover, the proffered information was not material to the case, it was cumulative and only could affect the credibility of the witnesses. We conclude that Judge Huber properly determined that an evidentiary hearing was not warranted.
Grecco also argues that the cumulative effect of the trial judge's ruling deprived him of a fair trial. To support his contention, he relies on State v. Orecchio, 16 N.J. 125 (1954).
In Orecchio, defendant's conviction was reversed because the trial judge committed numerous errors which were of such magnitude as to deprive the accused of a fair trial. 16 N.J. at 129. The State argues that Grecco's claim is meritless, and we agree. Here, Judge Huber's rulings were entirely proper. A fair reading of the record below reveals that the jury's verdict was consonant with the weight of the evidence presented. Hence, the cumulative error doctrine does not apply.
Finally, Grecco contends that his presumptive seven year sentence imposed for his conviction of the second degree crime of bribery is manifestly excessive, and that his sentence is excessive in comparison to the sentence imposed on Conway.
N.J.S.A. 2C:44-1(a) and (b) require the sentencing judge to consider aggravating and mitigating criteria when establishing *175 a sentence. Judge Huber considered each of the suggested factors. He found the following aggravating factors to be relevant:
(1) The nature and circumstances of the offense and the rule of the actor therein.
(3) The risk that defendant will commit another offense.
(4) A lesser sentence would depreciate the seriousness of the offense.
(5) The likelihood defendant is involved in organized criminal activity.
(9) Deterrence of defendant and others.
Judge Huber stated on the record that the following mitigating circumstance was relevant:
(7) Defendant was a first offender.
In addition, the judge reviewed the totality of the circumstances, including Grecco's background, the circumstances of the offense and the information contained in his presentence report.
Grecco was convicted of paying a bribe to a New Jersey State trooper in exchange for the trooper's agreement to alter his police report. The purpose of the bribe was to assure that Lombardo could avoid prosecution. The State's proofs at trial show that he initiated the idea of offering the State Police officer money. Further, the bribe itself was an attempt to undermine the integrity of the criminal justice system. The fact that the act was undertaken for the benefit of another makes the bribe even more insidious. Grecco was not motivated because of personal jeopardy or jeopardy facing a close family member. Perhaps in such a situation, the underlying motivation could produce more sympathy. But in defendant Grecco's case, it was simply a matter of business. We agree with the State that such a brazen act deserves the complete and unmitigated contempt of the citizenry of this State.
The standard of review for sentencing is whether the sentencing judge abused his discretion by imposing a sentence that was manifestly excessive under the circumstances. State v. Butler, 89 N.J. 220, 232 (1982). A "clear and compelling finding of miscarriage of justice" must be shown. State v. Whitaker, 79 N.J. 503, 514 (1979). The judge's sentence is presumed to be *176 reasonable. 79 N.J. at 514. An appellate court has the power to modify a manifestly excessive criminal sentence but such power must be "exercised sparingly and only upon a `clear showing of abuse of discretion.'" 79 N.J. at 512.
Judge Huber balanced all aggravating and mitigating factors in this case and stated his reasons for imposing the statutorily presumptive term on Grecco. R. 3:21-4(e). We agree with his appraisal and find no abuse of discretion. We find the sentence not to be manifestly excessive.
The judgments of convictions are affirmed.
NOTES
[1] The number of the State Grand Jury Indictment is presumably erroneous. The correct indictment number probably should be 87-81-5(1).
[2] The complaint was subsequently dismissed.
[3] DC designates Donald Conway.

JL designates Joseph Lazaro.
JB designates Joseph Barcellona.
[4] Grecco also cites United States v. Gibbs, 703 F.2d 683, 699 (3 Cir.1983), as supporting his claim. The Gibbs court addresses the coconspirator exception to the hearsay rule and the confrontation clause. The opinion in Gibbs, however, has been withdrawn because the case was reheard en banc in October 1983. The Third Circuit has not announced its decision to date.