IN THE MATTER OF DAVID FRIEDLAND, MICHAEL A. QUERQUES AND NORMAN ROBBINS, ATTORNEYS AT LAW OF NEW JERSEY.

Argued February 23, 1971—Decided July 27, 1971.

*Mr. Charles M. Egan, Jr.* argued the cause as Special Prosecutor (*Mr. Charles M. Egan, Jr.* and *Mr. William R. Albrecht* on the brief).

*Mr. Isadore Glauberman* argued the cause for respondent Friedland.

*Mr. Stephen B. Wiley* argued the cause for respondent Robbins (*Eileen M. Cornell* on the brief).

*Mr. Daniel E. Isles* argued the cause for respondent Querques (*Mr. Daniel E. Isles* and *Mr. Harvey Weissbard* on the brief).

The opinion of the Court was delivered

PER CURIAM. This is a disciplinary action. On May 13, 1969, we appointed Superior Court Judge Alexander Waugh as a Master to hear certain charges against David Friedland, Michael Querques, and Norman Robbins, Attorneys at Law, involving an alleged improper arrangement for the dismissal of two criminal complaints filed in the Municipal Court of the Township of Woodbridge. The charges arose out of a loan sharking operation. After an extended hearing between April 6 and June 17, 1970, Judge Waugh found all three attorneys guilty of improper conduct and recommended disciplinary action.

The genesis of this action was a usurious loan made by John Di Gilio to Julius Pereira. During the late summer of 1966, Pereira, the owner of a car wash in Iselin, Middlesex County, was experiencing severe financial difficulties. Unable to borrow through legitimate lending institutions, he sought aid from private sources. At the suggestion of a

Gerald Grimaldi, he was introduced to Di Gilio and a loan was arranged. By the terms of the loan, Pereira received $1,000 in cash to be repaid at the rate of $50 a week interest until he could repay the entire principal at "one time." For about a month, Pereira made his $50 a week interest payments in cash to Di Gilio's messenger, the "Moose." Later, in accordance with a telephone call he received, Pereira began making payments to Grimaldi, "Little Gerry." Eventually, Pereira began making his interest payments by check made out payable to "cash." The checks were cashed by several persons including Grimaldi, his secretary, and Di Gilio's wife.

During the late summer of 1967, Pereira borrowed an additional $1,000, and his interest payments were increased to $100 per week. Either or both loans could be canceled only if the entire principal were paid off in a lump sum, a payment Pereira was, of course, in no position to make.

Unable to meet the $100 weekly interest payments, Pereira defaulted. Thereafter, in January of 1968, he received a visit from two of Di Gilio's henchmen who left him with the clear impression that violence might come to him if he did not resume payments. As a result, Pereira communicated his problem to the State Police.

In February, the loan was renegotiated because of Pereira's inability to meet its terms. Payment was reduced to $50 a week upon Pereira's agreement to repay $4,000 for the $2,000 borrowed.

Although he accepted the "deal," Pereira soon decided to stop all payments, and he notified Grimaldi of his intention. As a result, Pereira received a threatening telephone call on April 25, 1968. The caller identified himself as "Johnny" and told Pereira that unless he resumed payments to "Little Gerry," the caller would "come down and chop your f------ head off." Pereira taped the call and after contacting the State Police, made a complaint in municipal court on April 26 charging John Di Gilio "did with intent to extort money or other thing of value, *directly or indirectly,* threaten to

kill the complainant * * *." On May 22, 1968, Pereira was visited by four men at his car wash who proceeded to damage the premises while Pereira hid in his office. After they left, Pereira immediately notified Detective Sergeant Justin of the State Police who, after inspecting the premises, filed a complaint in the municipal court based on information and belief charging Di Gilio with malicious destruction of property in violation of *N. J. S. A.* 2A:122–1. Although Di Gilio was later indicted with two others for conspiracy to make the threatening telephone call and to damage Pereira's property he was acquitted of these charges. Nevertheless, the Master found as a fact that he was connected with both events. Our own examination of the record convinces us beyond any doubt that both the property damage and the previous threatening telephone call resulted from Pereira's refusal to live up to the terms of Di Gilio's vicious loan sharking arrangement and that Di Gilio was indirectly responsible for both events.

This brings us to the roles played by the three respondents in this affair.

After warrants were issued on the two complaints, Di Gilio was arrested in Jersey City on May 23 and was arraigned the same day. Respondent Querques represented him at the arraignment in Woodbridge Municipal Court. In this capacity Querques secured Di Gilio's release on a recognizance bond pending the outcome of a preliminary hearing which was originally scheduled for May 31, 1968, but which was subsequently twice adjourned.

In late May, respondents Friedland and Robbins became involved in the case under somewhat curious circumstances. Respondent Friedland was retained by Di Gilio because, according to Friedland, Di Gilio was not satisfied with the manner in which Querques proposed to handle the case. Querques wanted to defend the criminal charges because he believed that Di Gilio's alibis concerning the two crimes constituted perfect defenses. Di Gilio, on the other hand, preferred to settle the problem quietly out of court if possible.

To this end, Friedland said, Di Gilio proposed to bring or to threaten to bring a malicious prosecution action in civil court to get Pereira to drop the charges. Querques, apparently recognizing his client must have been indirectly connected with the charges, thought that Di Gilio must be "crazy" to suggest such a thing. The Master found that the threat of a malicious prosecution suit did not play any part in the proceedings which followed; Friedland's aim was to pay Pereira a sum of money to drop the charges so as to avoid a public airing of those charges. The record amply supports this finding.

Robbins' entry into the affair is even more curious. He says that late in May, 1968, he received a telephone call from a Middlesex County attorney, asking him whether he represented Pereira and saying that Pereira had filed "some crazy complaint." Robbins told the attorney he had represented Pereira in several matters, but had heard nothing of any complaint. The attorney suggested that Robbins might receive a call from respondent Friedland and he requested that Robbins show Friedland every courtesy.[1]

On June 1, 1968, Pereira attended the Woodbridge Mayor's Ball acting as host in his capacity as President of the Young Democrats Club. Although the evidence is in dispute, the Master found, and we agree, that after greeting Pereira in the hall, Robbins pulled him aside and initiated a conversation involving the criminal complaints. In the course of the conversation Robbins indicated that the complaints had to be disposed of and that Pereira would get his money back if he withdrew the complaints. Pereira was amenable to this suggestion.

Shortly after June 1 negotiations began between Friedland and Robbins. The negotiations were initiated by Fried-

---

[1]This call contradicts Friedland's testimony that he was not retained by Di Gilio until sometime after June 1, 1970. Since the attorney who called mentioned Friedland's name to Robbins in May, it follows, and the Master so found, that Friedland had been retained prior to June 1.

land who called Robbins supposedly to advise him that Pereira was abusing the criminal processes by bringing false charges against Di Gilio. Although both Robbins and Friedland have stated in their testimony and in their briefs that they believed Pereira's charges against Di Gilio to be without any foundation, the Master found, and we agree, that that testimony was incredible. Robbins listened to the tape of the threatening telephone call and no one could have heard that tape without realizing it was made at Di Gilio's perpetration to enforce the terms of the usurious loan. Equally incredible is Robbins' testimony that he believed his client might be exposed to a suit for malicious prosecution.

The terms of the final settlement make it clear that both Friedland and Robbins were aware that there was some basis for Pereira's charges against Di Gilio and that these charges motivated and were the core of the settlement. In the settlement it was agreed that Di Gilio would pay Pereira $6,500 in cash, Pereira would see that the criminal complaints were withdrawn, and the parties would exchange mutual releases. Although the $6,500 was allegedly a return of the illegal interest, it is clear that neither Robbins nor Friedland ever made any serious effort to determine the true amount of illegal interest or that that amount was ever a significant factor in negotiations. Rather, the negotiations involved the question of what price Di Gilio was willing to pay to get Pereira "off his back" by withdrawing the criminal complaints, and the Master's finding that this was the real subject of the settlement is amply supported by the record. It is worth noting in this connection that in his brief Robbins asserts that the maximum amount of usurious interest paid by Pereira was $4,690. This raises the obvious question of why the settlement of $6,500 was so readily agreed to. Subtracting the $2,000 cash loan which Pereira received from Di-Gilio and which had never been repaid, Di Gilio owed only a net of $2,690. Moreover, according to both Robbins and Friedland, Di Gilio had the additional bargaining point of a threatened suit for malicious prosecution. In light of these

facts it is impossible to come to any other conclusion but that the proposed settlement was for the sole purpose of suppressing the criminal complaints and that respondents Robbins and Friedland were aware that there was a basis for the complaints.[2]

On the afternoon of June 26, the day before the adjourned hearing in the Woodbridge Municipal Court, Di Gilio brought $6,500 in cash to Friedland's summer home. Later that night, Robbins picked up the money (again in cash). There were no receipts exchanged in any of these transactions.

On June 27, respondent Querques appeared at the Woodbridge Municipal Court with Di Gilio "as a favor" to Friedland who was on vacation. He had prepared a general release to Pereira signed by Di Gilio. Robbins had told Pereira that he could not appear in municipal court on Pereira's behalf because of his position as municipal prosecutor. Nevertheless, as the Master found, Robbins prepared a release to Di Gilio and assured Pereira that he would be in the building. For the purpose of the hearing on June 27, Pereira retained another attorney who witnessed his signing of the withdrawal.[3] True to his promise, Robbins was in the municipal building and indeed was present in the courtroom when the charges were dropped. He was displeased that Pereira had another attorney present and he caused Pereira to send the other attorney away. After noticing Robbins' presence in the courtroom, the magistrate said, "Good morning, Prosecutor,"

---

[2] Respondents also suggest that Pereira never intended to press the criminal complaints, but only instituted them for the purpose of forcing Di Gilio to repay the usurious interest. This suggestion is incredible. Pereira brought the complaints immediately following criminal threats and acts while in terror of his life and he did so at the suggestion of the State Police. He had not retained an attorney at this point, nor did he at that time press Di Gilio for repayment. Rather, as the Master found, it was Robbins who sought Pereira out and initiated this proposal, and although Pereira was certainly a "willing client," this would not be unexpected of him especially considering his financial straits.

[3] The Master found this attorney to be innocent of any wrongdoing and we agree with that finding.

* * * Mr. Robbins * * * there is a withdrawal being made in this case * * *." Although he was uncertain about whether he also asked, "Do you join," the magistrate noted on Pereira's complaint, "Atty. Norman Robbins for Pros. — joins in recommendation of dismissal * * *." Thus, the magistrate assumed, and the Master found he was intended to assume, that Robbins was appearing as municipal prosecutor to consent to the withdrawal. Unfortunately for him, the complaint charged an indictable misdemeanor which could not be dropped without the consent of the county prosecutor. Robbins admitted that, prior to this point, he did not realize that the consent of the county prosecutor was required.

After the hearing at the Woodbridge Municipal Court, Robbins found himself in an awkward position. Pereira was insistent that he receive his payment for dropping the charges. Robbins had the cash in the back of his desk drawer, but said he could not disburse the funds until the county prosecutor approved the withdrawal of the criminal complaints. Friedland, on the other hand, testified that he was "irritated" that the funds were not paid out, although this testimony is incredible in light of the terms of the settlement. At this juncture, Pereira became distrustful of Robbins and taped several telephone calls between Robbins and himself regarding Robbins' refusal to pay out the moneys. The tapes of these telephone calls make it plain that Robbins understood fully that the quid pro quo for the $6,500 was the dropping of the criminal complaints and that the money could not be disbursed until they were finally "no billed." When Pereira became disgusted and suggested that he might reinstate the criminal complaints, Robbins told him that would be "ridiculous" and to "wait a little longer." Robbins repeatedly called the prosecutor's office in an effort to get prosecutorial approval for a dismissal of the charges. The county prosecutor testified that he believed Robbins was acting in his role as municipal prosecutor and Robbins did nothing to dispel that impression. In one of the taped telephone calls, Robbins admitted to Pereira that he had never

told the prosecutor of his true reason for seeking the dismissal and in fact had concealed the true nature of the matter.

Eventually, on August 30, 1968, the Middlesex County Grand Jury returned a no bill against Di Gilio.[4] Shortly thereafter Robbins turned over the funds to Pereira withholding a $1,000 fee and an additional $500 which he had personally loaned Pereira.

It is worth noting that during this entire period, ranging from the time they entered the case until December 1968, after the whole matter came to public attention, neither Robbins nor Friedland kept a file on the case, neither wrote or received any letters, and neither gave a receipt for fees received. Despite the long period during which Robbins had possession of the $6,500 in cash he never deposited the money in his trust account; instead he kept it in the back of his desk drawer. In short, the atmosphere surrounding all matters associated with the Di Gilio loan and the events before and after the dismissal of the criminal complaints was one of secrecy, and aside from the numerous violations of court rules which respondents Friedland and Robbins were guilty of in an effort to keep the matter secret,[5] the secrecy itself belies their testimony that they believed their conduct to be wholly innocent.

The basic contention of the three respondents is that they participated in the negotiations of a valid settlement of a

---

[4]Later, in January 1969, after the matter reached public attention, Di Gilio and two others were indicted by the Middlesex County Grand Jury on charges arising out of the loan transaction. Di Gilio was eventually acquitted of these charges.

[5]The Master found that Robbins and Friedland were guilty of violating several of the rules then in effect. He found both guilty of violating R. R. 1:12–5(a)(1) in failing to deposit the $6,500 in their trust accounts; R. R. 1:12–5(b)(4) in failing to retain copies of statements to their clients showing the disbursement of funds to them; R. R. 1:12–5(b)(5) in failing to retain copies of the bills rendered to their clients, and R. R. 1:12–5(f) in failing to make records "at or near the time of the act, condition or event recorded." These violations are not denied and are in themselves a basis for disciplinary action. R. R. 1:12–5(h).

civil dispute which included the dismissal of criminal charges for which there was no factual basis. Although they readily concede that the Di Gilio loan was usurious, respondents point out that usury was not a crime in this state at the time the loan was made.[6] Moreover, they urge that Di Gilio did not himself commit either of the criminal acts done in connection with that loan — the threatening telephone call and the damage to Pereira's car wash — and that Di Gilio was acquitted by a jury of a charge of conspiracy to commit those acts. However, it is entirely clear to us, as it was to the Master and as we believe it was to the respondents, that both criminal offenses were committed to enforce the terms of the Di Gilio loan and that Di Gilio was indirectly involved in both acts. His later acquittal is not binding in an ethics proceeding, see *In re Pennica*, 36 *N. J.* 401, 418–419 (1962), and in any event we do not believe that the ethical misconduct of the respondents was in any way diminished because Di Gilio was eventually acquitted.

■ At common law, compounding an offense in agreeing not to prosecute it was a crime. *State v. Leeds*, 68 *N. J. L.* 210 (Sup. Ct. 1902). A person wronged by the criminal act of another may accept restitution for the civil wrong done to him, but he cannot lawfully agree not to prosecute the crime. The reason is that private vindication of the injury done to the victim does not vindicate the public interest in securing justice. Procuring compensation for the victim of a crime is subordinate to the State's interest in causing crimes to be punished. Of course, for a person to be guilty of compounding an offense, the underlying offense must have been actually committed.

Respondents say they are not guilty of the crime of compounding because Di Gilio was later acquitted of the criminal charges. But respondents are not charged here with committing the crime of compounding and hence we are not

---

[6] *N. J. S. A.* 2A:119A–1 *et seq.* making loan sharking a criminal act did not become effective until November 18, 1968.

concerned with what would be the effect of Di Gilio's acquittal if the respondents had been so charged. See *State v. Hanson*, 69 *N. J. L.* 42 (Sup. Ct. 1903). The charge against respondents is that they sought to thwart the prosecution of criminal charges by an arrangement involving the payment of money conditioned on the successful effort of the complaining party to have the charges dismissed. The criminal law does not of course exhaust the ethical duty of a lawyer, and respondents breached that duty irrespective of Di Gilio's acquittal, for the unethical quality of their conduct consists of thwarting the criminal process without regard to whether the party complained of is in fact guilty. It is not for them to determine whether one charged with a crime is guilty; this must be left to those legally charged with that responsibility. Of course, where the party complained of is actually guilty, the wrong done the public is even greater, for the wrongdoer goes unpunished and undeterred from continuing his criminal conduct. Where, as here, the evidence overwhelmingly shows that the charged crimes were committed by someone, and that respondents knew Di Gilio was involved, we cannot overlook their breach of faith with the public simply because Di Gilio was later acquitted.

We conclude, as did the Master, that the respondents were guilty of unethical conduct in connection with the dismissal of the criminal charges against Di Gilio. However, we believe that respondent Querques was less culpable than either Robbins or Friedland. While the Master found and we agree that Querques was fully aware of the nature of the negotiations between Robbins and Friedland, that he prepared the final release from Di Gilio, and that he appeared in court in Friedland's stead, we nonetheless believe that he should be subject to less discipline than the other two respondents. He did not arrange the bargain and his participation in it was minor compared to that of Friedland and Robbins.

Respondent Robbins was also found by the Master to be guilty of a conflict of interest in carrying out his duties as municipal prosecutor and his duties as attorney for Pereira.

We agree with this conclusion. Although the crimes actually charged were not those which would be prosecuted by a municipal attorney, Robbins by his own admission did not know this until after his abortive courtroom appearance in which he gave the clear impression that he was representing the municipality in approving the dismissal. That he was in error in no way palliates the wrong. Moreover, he led the county prosecutor to believe that he was seeking the dismissal of the complaints in his role as municipal prosecutor. This was an abuse of his public trust.

In the future, should an attorney wish to have complaints dismissed by his client he must first go before the prosecutor and a judge and make a full and open disclosure of the nature of the charges and the terms, if any, under which the dismissal is sought. The dismissal should not be consented to unless both the judge and the prosecutor are satisfied that the public interest as well as the private interests of the complainant will be protected. Obviously, a consent could never be given in a case such as the present one involving a vicious loan shark scheme enforced through threats and violence. Rather, the nature of the charges cried out for further public investigation and exposure.

Since this type of conduct has not previously been before us in a disciplinary proceeding, we feel that the fulfillment of our duty and the interests of the profession and the public will best be served by a lesser penalty than shall be meted out in future cases of this kind. Accordingly, we suspend respondents Robbins and Friedland from the practice of law for a period of six months. Respondent Querques is suspended for a period of three months.

*For suspension for six months*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*Opposed*—None.

*For suspension for three months*—Chief Justice WEIN-TRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*Opposed*—None.