IN THE MATTER OF VINCENT P. RIGOLOSI, AN
ATTORNEY-AT-LAW.

Argued September 23, 1986—Decided June 10, 1987.

*Thomas J. McCormick,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Morrill J. Cole* argued the cause for respondent *(Cole, Schotz, Bernstein, Meisel & Forman,* attorneys).

PER CURIAM.

This matter arises out of an attempt to bribe a state policeman into dropping charges against a criminal defendant with ties to organized crime. The proposed means of effectuating the ruse was through the filing of a false police report and the failure of the policeman to identify the defendant. In the present case, the Honorable Charles Joelson, sitting as a Special Ethics Master (the Master), made detailed findings of fact, which were reviewed by the Disciplinary Review Board (DRB). Other facts are recounted in the companion case, *In re Conway,* 107 *N.J.* 168 (1987), and in *State v. Conway,* 193 *N.J.Super.* 133 (App.Div.), certif. denied, 97 *N.J.* 650 (1984). For our purposes, we shall summarize some of the background information.

–I–

Respondent was a long-time friend and business partner of Donald Conway in a building in Hackensack in which their respective law offices were located. He also was a friend of the Barcellona family and had performed legal services for Joseph Barcellona, who owned the Surf Club in Ortley Beach, Dover Township, and Joey's Place, a restaurant in Clifton. In addition, respondent was an old friend of Joseph Lazaro, who was Joseph Barcellona's cousin and the nephew of Sam Lazzara. Lazaro also was a sergeant in the state police and a friend of another state trooper, Denis McDowell.

Around 3:00 a.m. on July 19, 1981, Philip Lombardo, Jr. became involved in an altercation at the Surf Club with McDowell, who was off-duty. McDowell filed charges against Lombardo for possession of tear gas, *N.J.S.A.* 2C:39–4, simple assault, *N.J.S.A.* 2C:12–1, and resisting arrest, *N.J.S.A.* 2C:29–2. At the time, Lombardo threatened McDowell by asserting that he was a member of an organized crime family, subsequently identified as the Vito Genovese family. McDowell arrested Lombardo, who retained Conway as his lawyer.

On July 21, Lazaro called McDowell and asked him to come to Barcellona's apartment at the Surf Club. While at the apartment and before Barcellona arrived, Lazaro told McDowell that Lombardo was "a member of the Vito Genovese family" and McDowell understood "that there might be some danger to my family." The next evening, July 22, 1981, Barcellona called McDowell to set up a meeting on July 24. McDowell reported the events to a superior in the State Police, who advised him to record future conversations with Barcellona. Barcellona and Lazaro met on July 24, 1984, with McDowell in Barcellona's apartment at the Surf Club to discuss the strategy for the dismissal of the charges, including the filing of a misleading report of the altercation with Lombardo. McDowell recorded Lazaro's statement that Lombardo's father has "been in the * * Vito Genovese family for a long, long time." Lazaro related that Alfred Grecco (sometimes known as Al Washnick) had approached Barcellona and said, "Joe, if you could do this for us, anything the kid [McDowell][1] wants, he's got. We're talking five, ten. You name it, whatever." As summarized by the Special Ethics Master,

a discussion then ensued in which McDowell said that the " * * * report has not been turned in yet." Thereupon, McDowell and Lazaro discussed ways of composing a new and different report, and Lazaro concluded that there's "no risk of anything because I know the way it could be handled. You just gotta be smart on your end, that's all, you know * * * I know you could use the bucks,

---

[1]As an aid to comprehension, unclear references to various individuals will be supplemented with an identification of those individuals.

nobody else is taking a cut on anything, you know." At that point, Barcellona entered the room, and Lazaro informed him that McDowell had " * * * knocked out his report but * * * hasn't submitted it yet."

Without including every detail of the July 24 conversation, the Special Ethics Master concluded

that conversation was clearly one in which McDowell, Lazaro and Barcellona discussed the price to be paid for McDowell's altering his report and how and through whom the money would be passed. The meeting concluded by McDowell stating that he would " * * * go home and have a beer, sleep on this one."

Later that night, at 2:15 a.m., McDowell called Lazaro and said he could "make a soft report that would leave, give them a lot a loopholes." McDowell added, however, that he wanted "assurance" from Lombardo, Sr. "that whatever story we agree on he [Lombardo, Jr.] sticks to."

Thereafter Grecco paid $5,000 to Lazarra, who delivered it to his nephew, Barcellona, who, in turn, gave it to Lazaro. On July 25 Lazaro paid $5,000 to McDowell, who gave $100 back to Lazaro. In exchange for the payment, which was to be followed by another $5,000 when the charges were dropped, McDowell—who had delayed filing his initial report, which was detailed and identified Lombardo as the assailant—was to file an altered report that would enable him to decline to identify Lombardo.

On July 20, 1981, after he was retained by Lombardo, Conway consulted respondent, whom Conway knew to be friendly with Barcellona. Conway, who was contemplating a countersuit against Barcellona and the Surf Club, told respondent that Lombardo's father was a "mobster * * * of some importance in that area." Respondent immediately called Barcellona to introduce him to Conway in order to resolve the matter amicably. In addition to acting as "peace maker," respondent was motivated by Lombardo's threat of retribution against Barcellona.

Conway and Barcellona first met on July 22 in respondent's office. According to respondent, he learned at that time that there were factual differences between Lombardo's and McDowell's versions of the altercation. For example, Lombardo

contended he hit McDowell with a styrofoam coffee cup, but McDowell asserted that it was with a container of mace. Barcellona stated that it was for McDowell to decide whether to withdraw the complaint, and that he would ask Lazaro, who had an apartment in the Surf Club, to approach McDowell. Barcellona subsequently stated at the July 24 meeting with McDowell and Lazaro that respondent had assured him he could talk with Conway on the 22nd because Conway was a friend who would not "put anything on paper." Barcellona quoted respondent as saying, "and the guy [Conway] actually begged me to say anything that could be done. He says I mean anything." Although respondent denied making any such remarks to Barcellona, the Special Ethics Master resolved the conflict against respondent.

At the conclusion of the meeting, Conway, Barcellona, and respondent agreed to meet again at respondent's office on July 28. According to respondent, in a telephone conversation on that date, however, Barcellona told him that the meeting was "not necessary" because Barcellona had spoken to Lazaro, "and everything is going to be O.K., or he [Barcellona] may have said, and McDowell is going to withdraw the charges." Respondent then related that information to Conway.

Between July 28 and August 19, respondent stated he had no further involvement in the matter, in part because he was away from his office from August 13–18 due to the death of his brother-in-law in an automobile accident in Nevada. In respondent's absence, the plot proceeded. On July 28, McDowell showed Lazaro his altered report with "a lot of grey area about whether or not I [McDowell] was sure that the guy I grabbed was the guy that squirted me." The next night, July 29, McDowell met with Lazaro and Barcellona, who compared the altered version with a copy of the initial report, the original of which McDowell said he had shredded.

When confronted on August 16 with tapes of conversations with McDowell, Lazaro confessed his wrongdoing. He agreed

to assist the State Police in their continuing investigation by taping future conversations.

We concur with the statement of the DRB, based on the findings of the Special Ethics Master, that the evidence is "insufficient to prove respondent knew of, assisted or encouraged in advance the change by McDowell of his initial report * * * or the bribery of McDowell." But there is more, and respondent's subsequent conduct places him, if not in the center, alongside those in the web of deceit. Which brings us to the events of August 19, 1981.

As summarized by the DRB:

Respondent returned to his law office on August 19, 1981 after being away since August 13. During the morning he received a telephone call from Barcellona asking him to come to his restaurant with Conway to meet with him. Respondent had forgotten about the Lombardo incident because on July 28, 1981 he was told by Barcellona that it was not necessary to meet that day since McDowell was going to withdraw the charges. Respondent and Conway were informed by Barcellona that Lazaro had suggested that Conway ask for a line-up as a way of disposing of the Lombardo matter. Respondent immediately said that was a dumb idea. He questioned why McDowell did not go to the prosecutor and say he did not wish to press charges. Conway then agreed with respondent that a line-up did not make sense. Barcellona replied that they should speak with Lazaro and that he would relay their reaction.

Later on August 19, respondent received another call from Barcellona, who asked that respondent and Conway meet with him and Lazaro that evening. The four met at Joey's Place and, pursuant to his agreement with the State Police, Lazaro recorded the conversation.

Respondent's role as an adviser to the other conspirators becomes apparent from their conversation that evening in the upstairs room of Joey's Place:

Barcellona: So that's why I'd rather talk up here, I told him [Conway] what you [Lazaro] said, I met with him lunch hour, about the lineup and everything. Then Vince [respondent] came up with a point that I said you better talk to Joey. So you could carry it from there, Don [Conway].

Conway: Vince [respondent] brought up a point and I think maybe he's right, that ah.

Barcellona: Come on politician.

Conway: It might look like, ah might make the guy [McDowell] look bad, ah your friend look bad. Because ya know he makes an arrest of somebody, then he can't ID him. Believe me, ya know, ya don't know me but I guess you can understand that Vinnie wouldn't be here and that all of ya would have to just to make sure nobody gets hurt in this process.

Lazaro: Um hum.

Conway: Would it make him [McDowell] look bad if he says, if we had a lineup. I don't mind looking at the lineup. But does it make, ahh ...

Lazaro: Well to tell you the truth it was his [McDowell's] suggestion, and he felt a little more comfortable about doing that, ya know maybe just establishing a little doubt in the lineup rather than going in to the court or say before a grand jury hearing or something like that.

Rigolosi: Let me give you the benefit of my observation with that, I don't know what hap ... See if first of all, if he's gonna do something like that, ah, I was talkin' to Don [Conway] about it since Joey suggested it, ah, his, ah, his [McDowell's] inability to identify someone on a lineup would have to be consistent with the events of that night. He can't look like a total horse's ass, he can't.

Lazaro: Um hum.

Rigolosi: He can't make it appear that, well, I mean you certainly don't want anyone to get suspicious now how can this guy now say he doesn't recognize him, and that night, he signed a complaint against the guy.

Lazaro: Yeah.

Rigolosi: Ya know he [McDowell] caused complaints against this guy [Lombardo] to be signed, he knew that night. And he's not a layman; he's a police officer, who ah, made a determination on the night of the event that this guy committed these acts. Now he's sayin' I don't even rec ... I don't even know who it is. Or I don't recognize him, is what he's really saying. So it might cause someone and one thing ya don't want, is someone to say to him afterwards, hey listen you're getting cute? What, ah, what's happening here? You don't want to cause any further investigation beyond the investigation; however, it is possible that he may really because of the way things happened that night, not be in a position to know, ah look, I don't remember what the guy looked like. Ah, I'm not too sure, there were a lot of people around, the mace, the darkness, whatever. But I would think that, if that is so, or if it can be thought of as being so by whoever hears it, that the better way to do it is for him to tell the prosecutor, the assistant prosecutor, that instead of going through the formality of a lineup where, ah, it just may cause something beyond that to happen again.

Lazaro: Humm, good point.

Rigolosi: Ya know. It just may ah, see then it becomes a matter, it becomes an official part of the record. There's a lineup and Trooper McDowell is unable to identify his assailant.

Barcellona: Yeah but no, Vin [Rigolosi] I don't agree with that, I ah, I had to—

Rigolosi: Alright (inaudible).

Barcellona: (Inaudible) if you don't mind me saying Vin [Rigolosi]?

Rigolosi: No, no, I want you, because I don't know ...

Barcellona: By the way you're saying it, I think you're putting more into it. He [Conway] as the guy's [Lombardo's] lawyer, he's askin' for a lineup. He's gonna say my guy said he wasn't there; it wasn't him.

Rigolosi: Right.

Barcellona: I'm askin' for a lineup.

Rigolosi: Okay.

Barcellona: So now the trooper has to be called up and say jez ya know I can't pick this guy out. The way you're saying it now, already he called, already and asked for that court case—

Lazaro: Uh hum.

Barcellona: Remember what you said to me?

Lazaro: Yes.

Barcellona: You already made somethin' about this and now he's goin' to the prosecutor saying, please take me.

Rigolosi: No, no he's not going anywhere, I didn't mean that. No, I didn't mean that.

Conway: Ah, the thing that occurs to me immediately is, if, let's talk if somebody robs a bank, somebody comes in and robs it. The teller, the teller says yeah, I got frightened I couldn't ID the guy, that's one thing. But ah in this kind of situation, are there any other potential witnesses? Anybody? Suppose this fella says no, because I got blinded, I really don't know I, ya know, I couldn't see, I grabbed whoever I was closest to.

Lazaro: Well, do you have a copy of Denis's report?

Conway: No. No, I do not. * * * Never saw either one.

 * * * * * * * *

Lazaro: Alright [sic] well the report is down there now. And of course, ah I could show you the one I have in the car if you'd like to see that.

Conway: Yeah I would.

Rigolosi: Yeah I would like yeah, to take a look at it. Now let me explain, I don't mean he goes calls the prosecutor up and goes there. In a normal course of handling this, the prosecutor's office, the investigator is going to get in touch with him.

Barcellona: With Denis [McDowell] oh.

Rigolosi: Yeah.

Conway: I can start out right now by saying what is this shit? They got the wrong guy. And I'll say my client, ya know, is the wrong guy.

Rigolosi: Then he can do it on an informal basis; not like he's planned it, or ...

Conway: That's the wrong guy.

Rigolosi: No, I agree with that. He's not gonna call him and say (inaudible).

Lazaro: Oh Don, do you feel that this kid [Lombardo] would be reluctant to go in the lineup, is that a problem.

Barcellona: Oh no he said no, he would.

Lazaro: He would.

Barcellona: No the only point that we, Vince [Rigolosi] brought it up so on your side, so Denis [McDowell] don't get in trouble.

Rigolosi: Yeah, what I'm sittin' and thinkin' is ...

Barcellona: He said no. We would bring him down there in a minute.

Rigolosi: I don't wanta, I don't wanta (inaudible) them to call Denis [McDowell] up ...

Conway: Oh absolutely. This kid will do whatever I tell him to do, I have absolute control, whatever I say he'll do.

Rigolosi: Yeah, yeah.

Lazaro: Okay.

Rigolosi: No, and, and this is why we need your opinion. Because maybe I have to offer this as, as a possibility, because if it's a possibility that comes to pass then it's just gonna cause more problems and I want to avoid that.

Lazaro: Uh huh.

Rigolosi: You want to avoid that.

Conway: He's, really he brought it up to protect Denis [McDowell] absolutely.

Rigolosi: Yah but what happens if Denis

Conway: We just met at lunch time today. And Joey [Barcellona] was starting to tell us. And I said immediately I said sure he'll do it, I mean I'll, this kid will do whatever I tell him to do, it it'll be done, uh. But then Vince [Rigolosi] said jez maybe somebody might pick up on that.

Rigolosi: Let me ask you what would happen, what would happen if he did not, if there was a lineup, Don [Conway] asked for a lineup, had it, and ah he said he, ya know and he can not identify his assailant. Ah, now I don't know, I mean, I haven't seen the report yet. But is there any reason then for anyone to say hey Denis [McDowell] I, ah, you're, you're a policeman, you filed charges against this guy. He was arrested. He was brought down to, ah, local headquarters. There's been bail posted. We went through all of this. He's been charged with this, that, and the other thing. You're not a layman. Now you're sayin' that you couldn't, you don't know who it is or that this is the guy? Now, can that happen, is there any—

\* \* \* \* \* \* \* \*

Conway: Why don't we take a look at the report, I can't make, Joe. Can you do me a favor and get me the report?

Lazaro: Yeah.

Conway: If I look at it maybe I can see if there's anything that would cause him [McDowell] a problem.

Lazaro: Sure.

Rigolosi: Let me ask you one thing, was there, was there any, was there, was there contact that he [McDowell] had had with this guy [Lombardo] twice, or just the once, the other night?

Lazaro: Well.

Rigolosi: There were two events of the evening.

Conway: Vinny [Rigolosi], if we look at the report. He's free to go ...

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Rigolosi: Yeah, let's see the report.

When Lazaro returned, Rigolosi read the report to the others, during which Conway stated, "[a]ll right, we're in good shape." In response to an inquiry from Lazaro at the conclusion of the reading of the report whether "the line-up is a good idea ...", Rigolosi responded, "that becomes more consistent. That report, that's what I was askin ya earlier is his failure to identify in a lineup consistent with what he says happened that night. If that's what he says happened that night." Conway said, "[t]his is fine," and Rigolosi responded, "[t]he line-up (inaudible) might not be bad."

At the conclusion of the dinner meeting, respondent left with Lazaro. As explained by the DRB:

After having dinner at the restaurant with some of the meeting participants, respondent was given a ride to his office by Lazaro. Lazaro stated that McDowell had received $5,000 for his services in the Lombardo matter. The following colloquy then took place between respondent and Lazaro:

Rigolosi: Was that handled clean enough, that ah you know?

Lazaro: The money change?

Rigolosi: Huh?

Lazaro: The money change?

Rigolosi: Yeah.

Lazaro: You mean the transfer of money?

Rigolosi: Yeah.

Lazaro: As clean as possible. Because it went from, ah, Al [Grecco] to my uncle Sammy [Lazzara], who just gave me the money.

Rigolosi: Yeah.

Lazaro: And then I just brought it up to Denis and handed it directly to him. They promised him another five, after, once the thing goes ah, ya know.

Rigolosi: Yeah, yeah. Well, ah this, thing ought to, ah, you know, it oughta work out well, ah, if, I mean you know the guy. I don't know him. I don't want to meet him. I don't want to see him. And you know the only relationship with McDowell is because you know him and ...

Lazaro: Well you know, McDowell knows nothing of anything.

Rigolosi: Yeah.

Lazaro: That transpires ya, know, I tell him a bullshit story as far as what happened. He don't know my uncle is involved or anything like that.

Rigolosi: He don't know that?

Lazaro: No.

Rigolosi: He never heard my name?

Lazaro: No never heard your name, no way, no way.

Rigolosi: He never heard my name.

Lazaro: No, no I just—

Rigolosi: Ya see, the reason, the only reason, the only reason, if it was any other lawyer, I don't know anything. Yeah, I know Joe Barcellona, bye bye, you know. You want talk, Don I'm close to, I also know that, ah when he told me who it was, he came up to see me that Monday morning after this thing happened. (Inaudible) stopped at Joey. When he told me that it was Lombardo I said, ah shit, ya no and ah ...

At the ethics hearing, respondent maintained that on the night of August 19 he had heavily consumed alcohol and was strongly affected by it. As a result he contended he did not comprehend the significance of what Lazaro told him about the bribe. Respondent realized that the matter "smelled" and claimed that he would have nothing further to do with Lazaro or it. Early the next morning, respondent met Conway who disclaimed any knowledge of the bribe. He maintained that Lombardo's name meant nothing to him. Respondent also contended that he and Conway decided that they would have no further contact with Lazaro and would not go through with the line-up. In response to a question by the Special Ethics Master as to why they did not tell Lazaro they did not want anything to do with the bribe, respondent replied that they didn't know the details of what happened or why the money was exchanged. In response to another question about respondent's concern whether McDowell heard his name, respondent answered that he felt something was wrong and wanted to be sure that McDowell knew that respondent was not involved with that.

On September 2, 1981 Lazaro telephoned respondent. Conway was in respondent's office at that time. Respondent explained that Conway did not ask for the line-up because in discovery he received a municipal police report which contained language that made it difficult to go through with a line-up. Respondent added that they had several options to consider for a disposition favorable to Lombardo. He added that Conway felt good about it and everything would be all right. The tone of this conversation was extremely cordial and respondent even wished Lazaro an enjoyable trip to Florida.

The Master found that "the content of the conversation casts a dark shadow" on respondent's explanation that he accepted the telephone call in order to get rid of Lazaro.

The DRB report continues:

On October 19, 1981 when a probable cause hearing was scheduled, an assistant Ocean County prosecutor informed Conway that the Lombardo case would be dismissed because the trooper could not positively identify Lombardo. Two days later Barcellona gave Lazaro an envelope containing $5,000 to be delivered to McDowell.

As a result of this, respondent and others were indicted by a state grand jury. Following a jury trial from September 13 through November 4, 1982, respondent was acquitted on all counts. [Footnote omitted.]

Both the Master and the DRB found that respondent violated various provisions of the former Disciplinary Rules, which were in effect in 1981. Those Rules have since been succeeded by the current Rules of Professional Conduct, which are substantially similar to the former rules. Like the Master and the DRB, we evaluate respondent's conduct under the Disciplinary Rules, indicating also the comparable provision of the Rules of Professional Conduct now in effect.

Both the Master and the DRB found that respondent violated *DR* 1–102(A)(3), which provides that a lawyer shall not "[e]ngage in illegal conduct that adversely reflects on his fitness to practice law;" *DR* 1–102(A)(4), which provided that a lawyer shall not "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation;" and *DR* 1–102(A)(5), which provided that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice."

In reaching that result, the Master found by clear and convincing evidence that respondent, although he did not know in advance of the attempt to persuade McDowell to alter his report or of the attempt to bribe McDowell,

became aware of these events after they had transpired and that after he knew of the change in the McDowell report and subsequently of the bribe in payment for such change, he nevertheless continued his efforts to achieve a result favorable to Lombardo by taking advantage of the changed report as well as of McDowell's purchased cooperation and malleability. By so doing, he joined and participated in the scheme, although it may have originally been contrived by others. I do not find that there has been proof that respondent profited monetarily from his role in this matter, nor that he expected any share of Conway's fee. Absent such proof, I accept his contention that he was motivated solely by a sense of loyalty to friends and a background of wanting to help friends. However, lending a helping hand to friends is no justification for his improper conduct. It is clear that respondent counseled and advised in this matter, and that in giving his counsel and advice, he utilized and took advantage of what he knew to have been illegal acts of others performed to "fix" a criminal charge by means of bribery.

The DRB joined in that conclusion and concluded further that

[u]pon a review of the full record, the Board is satisfied that the conclusions of the Special Ethics Master in finding unethical conduct on the part of respondent are fully supported by clear and convincing evidence.

A review of the detailed factual scenario discloses the complex web that was devised to have charges dismissed against the son of an alleged mobster. Although respondent was not retained by any party involved, he played an active role as an advisor in the matter. The focus must be on what transpired on August 19, 1981 at the meeting in Barcellona's office. Initially respondent disapproved of a plan to hold a line-up at which McDowell would claim he was unable to positively identify Lombardo. Respondent did more than just debate the merits of this proposal. He suggested that McDowell informally advise the prosecutor when contacted by that office that there were identification problems. He also expressed concern a number of times whether such faulty identification was consistent with the arrest report. When he read the altered police report, comments were made by others that the report had been substantially changed. Respondent's testimony that he knew the second report was different but did not know it was false is not credible. If these remarks had not alerted respondent, or any reasonably prudent person, that something was amiss, the conversation between respondent and Lazaro in Lazaro's car clearly should have. There is clear and convincing evidence that respondent was informed by Lazaro and understood that McDowell received a $5,000 bribe in connection with the Lombardo matter. In answer to respondent's question, Lazaro explained the circuitous route the money took before it reached McDowell. Respondent also questioned whether his identity was known to the trooper and was assured that it was not. Respondent acknowledged in his testimony that he realized a bribe had been paid and decided he would have nothing more to do with it.

However, the Board finds that respondent's actions were not consistent with this thought. Although he confronted Conway with this information and Conway disclaimed any knowledge of it, respondent's conversation with Lazaro on September 2, 1981 does not support the contention that he sought to disavow any participation in this illegal scheme. In that conversation, respondent discussed with Lazaro several options available to achieve a favorable disposition for Lombardo, assured Lazaro that Conway felt everything would be all right and wished Lazaro an enjoyable trip to Florida. A review of this conversation does not support respondent's contention that he would have nothing further to do with this matter.

\* \* \* \* \* \* \* \*

Respondent's actions and inaction reflect upon the integrity of the bar and the criminal justice system. Respondent knowingly participated in and aided the completion of a scheme to subvert the criminal process. His actions were not merely those of a concerned friend; he willingly proffered his legal expertise to further the scheme.

Finding that "[r]espondent failed miserably in his obligations as a responsible member of the bar," three members of the

Board recommended that respondent be suspended for a period of two years. Three other members of the Board found substantial factors in mitigation of respondent's conduct. In this regard, the DRB report states:

This is the first disciplinary proceeding against respondent, a member of the bar for 27 years. The misconduct consisted of a single incident fostered by a misguided attempt to mediate possible cross complaints and adverse civil consequences to a long time friend and client. There was no pecuniary gain to respondent. Respondent's reputation in the legal and civic community and years of service to the community and his years of service to the community and his profession cannot be ignored. The many letters submitted on respondent's behalf evidence his character and the esteem in which members of the profession and community hold him and of their continued faith in him. Assessing these many factors, it is unlikely "that he will engage in similar activities in the future." [Citations omitted.]

The remaining three members of the DRB disqualified themselves from participating in the matter, with the result that the voting members of the DRB were evenly divided whether respondent should be publicly reprimanded or suspended.

–II–

This matter inevitably enlists a comparison to the companion case, *In re Conway, supra,* 107 *N.J.* 168. Both attorneys became implicated in events initiated by others. Both were indicted for alleged criminal conduct, and Conway was convicted of conspiracy, *N.J.S.A.* 2C:5–2, and tampering with a witness, *N.J.S.A.* 2C:28–5a(1), (2) and *N.J.S.A.* 2C:2–6. Respondent was acquitted of all charges. Conway, although he had not previously represented Lombardo, was acting as his attorney with respect to criminal charges. Respondent, who had previously represented Barcellona, was not acting as his attorney, but as an unpaid mediator. Conway's role in fixing the case against Lombardo was active; respondent's role consisted of that of an intermediary between Barcellona and Conway. He restricted himself to advising and counselling Barcellona, Lazaro, and Conway. The abiding question is whether respondent may be distinguished from Conway, whose disbarment is virtually compelled by his criminal convictions for conspiracy and

tampering with a witness. Those convictions "conclusively establish that [Conway] was an active co-conspirator and actual participant in the criminal scheme to alter and use the falsified police report and to have the arresting police officer give false testimony with respect to the identification of [Conway's] client." *In re Conway*, 107 *N.J.* at 664, *supra*.

■■ At the outset, we recognize that the same reasoning does not apply to respondent, who was acquitted of all criminal charges. Nonetheless, we recognize also that "[a]cquittal of a member of the bar following trial of a criminal indictment is not *res judicata* in a subsequent disciplinary proceeding based on substantially the same charge or conduct." *In re Pennica*, 36 *N.J.* 401, 418 (1962). *Accord In re Hyett*, 61 *N.J.* 518 (1972) (attorney indicted for bribing a police officer was disbarred notwithstanding acquittal of criminal charges because of insanity); *In re Callahan*, 70 *N.J.* 178, 184 (1976) (despite acquittal on criminal charges, court found evidence clearly and convincingly linked respondent to bribery and ordered disbarment). The purpose of a disciplinary proceeding, as distinguished from a criminal prosecution, is not so much to punish a wrongdoer as it is to protect the public from an untrustworthy lawyer. *In re Pennica, supra*, 36 *N.J.* at 418–19. Significantly, the standard of proof is different. In a criminal prosecution, the charges must be established beyond a reasonable doubt, but in a disciplinary proceeding, they need be proven only by clear and convincing evidence. *Id.* at 419. Thus, our task is to determine from an independent review of the record, notwithstanding respondent's acquittal of the criminal charges, whether it has been established by clear and convincing evidence that respondent engaged in illegal conduct that adversely reflects on his fitness to practice law, *DR* 1–102(A)(3); *RPC* 8.4(b); engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, *DR* 1–102(A)(4); *RPC* 8.4(c); and engaged in conduct that is prejudicial to the administration of justice, *DR* 1–102(A)(5); *RPC* 8.4(d). Our review of the record leaves us with no doubt that respondent has violated those Rules. The proof, most of it

from respondent's own mouth, reveals, as the Master found, "that respondent joined and participated in a conspiracy in violation of *N.J.S.A.* 2C:5-2."

Although the DRB agreed with the Master's conclusion that respondent "joined and participated in the scheme," its decision turned not on respondent's role as a co-conspirator, but on his knowledge "that there was a criminal scheme afoot to thwart the administration of justice * * *." Because respondent was an officer of the court, the DRB concluded that "[a]t the very least, respondent should have unequivocally informed Lazaro that he wanted no part of this activity." Notwithstanding that the DRB was "unanimous in its conclusion that respondent's misconduct warrants public discipline," three members voted in favor of a public reprimand. Noting that this was the only disciplinary proceeding against respondent in his twenty-seven years as a lawyer, they viewed the misconduct as consisting "of a single incident fostered by a misguided attempt to mediate possible cross complaints and adverse civil consequences to a long time friend and client. There was no pecuniary gain to respondent." These members were understandably impressed by "[r]espondent's reputation in the legal and civic community and his years of service to the community and his profession * * *." We share that impression. Respondent has served as county counsel for Bergen County, mayor of the City of Garfield, president of the Bergen County Bar Association, and assistant secretary of the State Constitutional Convention of 1966. He has also served as the attorney, prosecutor, or public defender for various municipalities and other public bodies. Citizens, clients, attorneys, and public officials have written numerous letters on his behalf. For these reasons, three members of the DRB recommended a public reprimand.

Notwithstanding those mitigating factors, we have a different view of the appropriate sanction. Our difference follows not from any lack of appreciation of respondent's participation in civic, political, and governmental activities. Rather, the point of difference is our perception of the significance of respon-

dent's role in the attempt to bribe the state trooper into filing a false report. Our perception differs also from that of the three members of the DRB who thought respondent should be suspended. Although they recognized "[r]espondent knowingly participated in and aided the completion of a scheme to subvert the criminal process," they viewed him as a spectator, not a participant. Hence, they focused on his obligation as an officer of the court to declare his disassociation from the scheme and to inform appropriate law enforcement authorities.

Our reading of the record leads us to conclude, however, that respondent played a more sinister part. He was not just an innocent bystander or dupe. We need not dwell on his motivation for participating in the scheme. His own words spoken at the table in the upstairs room of Joey's Place make clear not only that he was aware of the alteration of the police report but also that he counselled his co-conspirators. At various times he spoke at the meeting, introducing his comments with such phrases as:

Let me give you the benefit of my observation * * *.

But I would think that, if that is so, or if it can be thought of as being so by whoever hears it, that the better way to do it is for him to tell the prosecutor * * *.

Now let me explain * * *.

No, I agree with that * * *.

Yeah, what I'm sittin' and thinkin' is * * *.

Because maybe I have to offer this * * *.

These are not the words of a spectator, but those of a participant. They do not reflect doubt or dismay at the prospect of dismissal of criminal charges through improper means, but a desire to further that result.

That respondent knew of the bribe is made painfully clear from his question to Lazaro when they were alone in the car, whether the payment of money from Grecco to Lazzara to Lazaro to McDowell was handled "clean enough." Respondent's "only reason"—his words—for asking the question was to be sure that McDowell had not heard his name.

We conclude that for disciplinary purposes, respondent cannot be distinguished from Conway. We will never know why the jury in the criminal case convicted Conway and acquitted Rigolosi. Perhaps the previously mentioned differences in their roles, when measured against the standard applicable in criminal cases, that guilt must be established beyond a reasonable doubt, led the jury to acquit respondent. The standard applicable in disciplinary cases, that the culpability of the defendant must be established by clear and convincing evidence, however, is lower. We have no doubt that this standard has been met.

As in *Conway,*

> the ethical violations constitute a stark breach of professional fealty to the administration of justice. Respondent's misconduct equals in gravity the disloyalty to a client that is exemplified by an attorney's misuse or misappropriation of a client's funds. Consequently, disbarment is mandated. As aptly observed in *Verdiramo, supra,* 96 *N.J.* at 186, disbarment is appropriate for "ethical misconduct of this kind—involving the commission of crimes that directly poison the well of justice."

> We consider this kind of ethics violation—the purposeful, knowing and corrupt subversion of a criminal prosecution—to be *per se* evidence of professional unfitness. An attorney who engages in such conduct can never be trusted with the responsibilities of being a lawyer. Consequently, mitigating factors in this case cannot overcome the enormity of respondent's transgressions. * * * These factors would undoubtedly be relevant in a disciplinary proceeding that did not involve the purposeful subversion of the administration of criminal justice. However, in this case, mitigating considerations in this case cannot serve to condone or exonerate, they serve only to make respondent's disbarment a personal tragedy. [107 *N.J.* at 182.]

Before the Master, respondent testified that at the time of the events in question he was familiar with *In re Friedland,* 59 *N.J.* 209 (1971), and sought to adhere to its dictates. If respondent was familiar with that opinion, his conduct reflects not an adherence to, but a betrayal of, the admonitions in that opinion pertaining to the ethical obligations of an attorney seeking a dismissal of a criminal case when the defendant and the complainant have reached a settlement of a related civil claim. In *Friedland,* we stated, "[i]n the future, should an attorney wish to have complaints dismissed by his client he must first go before the prosecutor and a judge and make a full and open

disclosure of the nature of the charges and the terms, if any, under which the dismissal is sought." 59 *N.J.* at 220. Rather than complying with that requirement, respondent and Conway sought to procure a dismissal not by making "a full and open disclosure" of the charges and terms of the dismissal, but by corrupting the complainant into lying to the prosecutor and the court.

Respondent's conduct reveals a flaw running so deep that he can never again be permitted to practice law. This is not a case of a novice who had not yet had opportunity to develop a sense of ethics. Respondent was an attorney steeped in the ways of law, government, and politics. No amount of good works can save someone who, with all the knowledge and experience that he accumulated, "poisons the well of justice."

As with *Conway,*

[r]espondent was under no misapprehension that what he did was dishonest and corrupt. He cannot be excused or treated lightly because he thought, even for a moment, that his misconduct would not deservedly place him in dire professional peril. Such can never be a reasonable expectation in this kind of a case. [107 *N.J.* at 184.]

Our dissenting colleague accepts the fact that respondent knew of the scheme to falsify the police report and recognizes that respondent's dereliction requires serious discipline. In stopping short of disbarment, however, the dissent is ambivalent whether to accept the well-established principle that a "criminal acquittal does not itself preclude the imposition of an ethical sanction when the totality of the circumstances plainly mainfests an unethical, although not criminal, violation," *post* at 211, or to follow its own desire "to err on the side of the jury on the crucial question of whether respondent joined in the corrupt scheme," *post* at 211. We do not share the doubts of the dissent. The law is clear that a criminal acquittal does not exonerate an attorney from discipline, and the facts lead clearly and convincingly to the result that respondent was part of the conspiracy.

■ Respondent's participation was not limited to one meeting on August 19, 1981. His familiarity with some of the participants—Conway, Lazara, and Barcellona—went back years and covered a variety of personal, professional, and business transactions. Lombardo was, or claimed to be, part of the Genovese family, and, as the dissent states, Barcellona, respondent's friend and sometimes client, wanted to settle a score with that family. Furthermore, respondent's role was not limited to the events of August 19, 1981. His involvement began in July and extended into the month of September. Knowing that $5,000 had been paid to bribe a State policeman to file a false report, respondent counselled the co-conspirators on how best to arrange for dismissal of the criminal charges that were the subject of the report. His conduct, which involved dishonesty, fraud, and deceit, and which was prejudicial to the administration of justice, reflects his unfitness to practice law.

Under the circumstances, we have no alternative but to order the disbarment of respondent. He shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

O'HERN, J., dissenting.

I dissent from the judgment of disbarment in this case primarily for the reasons I stated in *In re Conway*, 107 *N.J.* 168 (1987), also decided today. Here, as there, I find an important factor in my judgment to be the uneven application of our precedent in similar disciplinary cases.

But here we do more than depart from precedent. We disbar an attorney exonerated by a jury of any criminal involvement in the corrupt scheme detailed in *Conway, supra,* 107 *N.J.* 168. I recognize that a criminal acquittal does not of itself preclude the imposition of an ethical sanction when the totality of the circumstances plainly manifests an unethical, although not

criminal, violation. *In re Pennica*, 36 *N.J.* 401 (1962). But when the central issue of ethical failure is so closely intertwined with the jury's finding of innocence on a single, crucial factual issue, respect for the meaning of trial by jury compels me not to impeach the jury's verdict.

For here, as in *Conway*, the dominating event is the meeting of August 19, 1981, requested by Sergeant Lazaro, at the direction of his superiors in the State Police, to solicit involvement of the lawyers in advancement of the bribery scheme that had been unearthed. At the secretly taped meeting, Sergeant Lazaro, a childhood friend of respondent Rigolosi, feigned to present McDowell's proposed testimony. The jury must have believed that Rigolosi, although knowing McDowell was changing his story, did not know that McDowell had been bribed to change his story and that discussion of McDowell's story was not aiding and effectuating the act of bribery.

On the other hand, it is obvious and incontestable, as the Special Master and the Disciplinary Review Board (DRB) found, that respondent knew that grave ethical questions surrounded the use of such testimony. We have disciplined attorneys even for suggesting that the processes of justice are for sale. *In re Milita*, 99 *N.J.* 336 (1985). We expect lawyers to adhere to conduct that does not permit even inferences of dishonesty. Respondent had to know that his involvement in this episode, however motivated, could not help but be seen as casting doubt upon the integrity of the criminal judicial process.

Hence, discipline is in order—but what discipline? Even respondent's most troubling statement to Lazaro on the way home after the August 19th dinner—"was that handled clean enough, that ah, you know?"—evokes the ethical ambiguity that our cases have sought to dispel. Does that ambiguity demonstrate the total failure of character that is the premise for disbarment in the absence of conviction of serious crime? It is not possible to read the transcript of these proceedings or of the trial without some sense of doubt in reaching the conclusion that respondent must be disbarred. There is *no*

unerring evidence that demonstrates that defendant has an utterly "unsalvageable professional character," or is "beyond the pale of professional rehabilitation." *In re Templeton,* 99 *N.J.* 365, 376, 377 (1985).

So uncertain were the State Police investigators of the meaning of the August 19, 1981, meeting and conversations that they believed it was necessary to gain further evidence to demonstrate criminal involvement. On this aspect of the case, the DRB agreed "with the finding of the Special Ethics Master that the proofs were insufficient to show that respondent knew of, assisted or encouraged in advance either the change by McDowell of his initial report or the bribery of McDowell." It was not until Lazaro spoke to Rigolosi on the way home after the August 19th meeting that respondent had to know that a corrupt plan was unfolding. Hence the State Police continued to call respondent to try to enmesh him further in the disposition of the case. It is quite clear that during the September 2, 1981, solicitation respondent refused to speak to Sergeant Lazaro until Conway came upstairs. By this time the lawyers were obviously suspicious of the conduct of Sergeant Lazaro.

The Chairman of the DRB questioned whether the conversation showed anything other than respondent "trying to distance himself and unload Luzzaro [sic]." What exactly did that conversation prove? Did the respondent, knowing of the evil intentions of Lazaro, fail to act in accordance with law or ethical duty? The jury acquitted respondent of failure to act in accordance with law. But the Special Master found, and the DRB concurred, that respondent "joined and participated in the scheme, although it may have originally been contrived by others." This finding is plainly inconsistent with the jury verdict. As noted, since all panels agree that Rigolosi had no prior knowledge of the bribe, the crucial question is—what did respondent do after the night of August 19, 1981?

The predicate for the DRB's conclusion was this:

"[A]ttorneys are 'officers of the court' with a special responsibility to protect the administration of justice * * *." *Cf. In re Hinds,* 90 *N.J.* 604, 615 (1982).

Thus, "as judicial officers, lawyers differ from ordinary citizens." *Id.* at 616. When respondent learned that there was a criminal scheme afoot to thwart the administration of justice, he was required to do more than he did. His claimed disassociation from the planned criminal act was totally inadequate. At the very least, respondent should have unequivocably informed Lazaro that he wanted no part of his activity. He also should have stated that he was duty bound to report the conversation to law enforcement authorities. See *N.J.S.A.* 2C:5–1d and 2C:5–[2]f(3).[1]

If that is the finding, what is the appropriate degree of discipline that we should impose upon an attorney who does not take affirmative steps to prevent the imposition of a fraud upon a tribunal. To my knowledge this is the first time that we have undertaken to measure the meaning of the duty imposed upon a non-party lawyer. *Cf. In re Yaccarino*, 101 *N.J.* 342 (1985) (client's disclosure of his plan to destroy evidence to other attorneys permits client's attorney to reveal evidence of criminal plan to proper authority). *Rule of Professional Conduct* 1.6(b)(2) requires an attorney to reveal information necessary to prevent his or her client from committing "a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to perpetrate a fraud upon a tribunal." Even in that direct context attorneys are told to be watchful that they not adopt "the role of judge or jury to determine the facts," *United States ex rel. Wilcox v. Johnson*, 555 *F.*2d 115, 122 (3rd Cir.1977), lest the client be deprived of independent advocacy. *Nix v. Whiteside*, 475 *U.S.* 157, ——, 106 *S.Ct.* 988, 1006, 89 *L.Ed.*2d 123, 149 (1986) (Brennan, J., concurring). The Rule poses a challenge for attorneys:

---

[1] I am not too sure of the relevance of the DRB's reference to this provision. The law has always carefully circumscribed criminal culpability for inchoate crimes. *N.J.S.A.* 2C:5–1d provides a *defense* for one who has *previously* participated in and subsequently renounced a criminal *attempt*, not a duty; 2C:5–2f(3) is to the same effect for one who has participated in criminal *conspiracy*. The finding here is that defendant had *not* previously participated in a criminal conspiracy. More to the point is *N.J.S.A.* 2C:29–1 (obstructing administration of *law* or other governmental function), although that section does not apply to "failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without *affirmative interference* with governmental functions." (Emphasis added).

Lawyers, one would think, would be among the last to make a virtue of informing. At the center of their professional code of conduct is a special obligation of confidentiality that is honored even at the cost of serious suffering and injustice. Although this strong obligation applies only within the limited area of 'confidences' and 'secrets,' the heroes of the legal profession tend to be those who keep secrets faithfully rather than those who blow the whistle on wrongdoers. [Lynch, "The Lawyer as Informer," 1986 *Duke L.J.* 491, —— (1986) (citations omitted).]

In some cases the fraud is transparent, making the choice clear; in others it may not be so. It is easy for us to conclude that respondent should have turned everyone in now that we know that McDowell was bribed. How then should we approach the issue of discipline under this Rule?

So uncertain is our precedent that the DRB was divided in its judgment of the appropriate discipline. Three members of the Board recommended two years of suspension. But the report also stated:

Conversely, three members of the Board find that there are substantial factors in mitigation of respondent's conduct which temper the need for suspension. This is the first disciplinary proceeding against respondent, a member of the bar for 27 years. The misconduct consisted of a single incident fostered by a misguided attempt to mediate possible cross complaints and adverse civil consequences to a long time friend and client. There was no pecuniary gain to respondent. [*In re*] *DiBiasi*, [102 *N.J.* 152, 156 (1986)]. Respondent's reputation in the legal and civic community and his years of service to the community and his profession cannot be ignored. *Matter of Weinroth*, [100 *N.J.* 343, 351 (1985)]; *In re Infinito*, [94 *N.J.* 50, 57–58 (1983)]; *In re Sears*, 71 *N.J.* 175, 199 (1976). The many letters submitted on respondent's behalf evidence his character and the esteem in which members of the profession and community hold him and of their continued faith in him. Assessing these many factors, it is unlikely "that he will engage in similar activities in the future." *In re Sears, supra*, at 200. *Matter of Templeton*, 99 *N.J.* 365, 374 (1985); *In re Goldstaub*, 90 *N.J.* 1, 5 (1982).

Suspension is not necessary to deter similar conduct by this respondent, nor can it be justified as a deterrent to others. Consequently, three members of the Board recommend that the Court impose a public reprimand.

Hence, I am even more troubled by the inconsistency of our precedent than in *Conway*. How strange it must seem that our most respected board of attorney discipline should fall so far from the Court's mark. This respondent has been found *innocent* of crime. In the span of cases that preceded the *Verdira-*

*mo* decision,[2] in *In re Infinito*, 94 *N.J.* 50 (1983), an attorney *convicted* of misusing another's property was given a three-year suspension; in *In re Rosen*, 88 *N.J.* 1 (1981), an attorney convicted of attempted subornation of perjury was suspended for three years; and in *In re Mirabelli*, 79 *N.J.* 597 (1979), an attorney who pled guilty to a charge of bribery was given a three-year suspension. I point out this precedent not because it commends itself to being followed, but because of the inconsistency it displays.

As I explained in *Conway*, I have arrived at this judgment by a different route from that of the other members of the Court. But even if I approached this question as does the majority, I would assign a pre-eminent value to the meaning of trial by jury. In cases like this, when the State has candidly acknowledged its use of State officials to engage others in the commission of crime (and I imply no criticism of that regrettably necessary means of law enforcement), it may be better to err on the side of the jury on the crucial question of whether respondent joined in the corrupt scheme.

There is no pristine truth in this case. There are no heroes: not the moonlighting State Police officer; not the veteran State Police sergeant who passed the bribe on to the young State trooper, not the bribers, and regrettably not respondents Conway or Rigolosi who knew that McDowell was changing his story. There is blame enough for all concerned. Although innocent of the plan to bribe, both attorneys could not help but know that with the admitted overtones of organized criminal activity (Conway's client, Lombardo, injected this issue into the case by threatening McDowell with reprisals), the last thing that could be tolerated was any suggestion of acquiescence in wrongdoing or favoritism. Lawyers know the only way to deal

---

[2]In *In re Verdiramo*, 96 *N.J.* 183 (1984), I concluded that the Court had adopted a clear precedent, applicable to cases occurring after that date, that conviction of serious crimes, particularly those involving dishonesty, would almost invariably warrantment disbarment. However, the Rigolosi incident occurred before the decision in *Verdiramo*.

with such matters. *See In re Friedland*, 59 *N.J.* 209 (1971). Hence I regard the ethical infraction as grave, and therefore view it as warranting a three-year suspension.

*For disbarment*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK and GARIBALDI—4.

*Dissenting*—Justice O'HERN—1.

## ORDER

It is ORDERED that VINCENT P. RIGOLOSI of HACKEN-SACK, who was admitted to the bar of this State in 1959, be disbarred and that his name be stricken from the roll of attorneys of this State, effective July 1, 1987; and it is further

ORDERED that VINCENT P. RIGOLOSI be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.